# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**STEVEN W. KINCAID**
Kincaid & Kincaid PC
Noblesville, Indiana

ATTORNEYS FOR APPELLEES:

**DONALD F. FOLEY**
**MARIE CASTETTER**
Foley & Abbott
Indianapolis, Indiana

FILED

Sep 23 2014, 9:40 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JESSICA KISHPAUGH, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1312-CT-1040 |
| | ) | |
| JOHN ODEGARD and MIRIAM ODEGARD, | ) | |
| | ) | |
| Appellees-Plaintiffs. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Robert R. Altice, Jr., Judge
Cause No. 49D05-1007-CT-32733

**September 23, 2014**

**OPINION - FOR PUBLICATION**

**RILEY, Judge**

## STATEMENT OF THE CASE

Appellant-Defendant, Jessica Kishpaugh (Kishpaugh), appeals the Judgment of the trial court, awarding $85,889.36 to Appellees-Plaintiffs, John (John) and Miriam (Miriam) Odegard (collectively, the Odegards).

We affirm and remand.

## ISSUES

Kishpaugh raises seven issues on appeal, which we consolidate and restate as the following four issues:

(1) Whether the trial court erred in holding Kishpaugh civilly liable for theft;

(2) Whether the trial court had subject-matter jurisdiction to declare that its order of treble damages is non-dischargeable in bankruptcy;

(3) Whether the trial court erred in determining that Kishpaugh breached the Residential Lease (Lease); and

(4) Whether the trial court erred in determining that Kishpaugh violated her obligations as a tenant under Indiana Code section 32-31-7-6 (Tenant Statute).

Although not raised in their brief as an issue on cross-appeal, the Odegards have filed a Petition for Appellate Attorney Fees.

## FACTS AND PROCEDURAL HISTORY

Kishpaugh and the Odegards met in the summer of 2007 when Kishpaugh responded to the Odegards' online advertisement for a babysitter. Over the next two years, Kishpaugh provided occasional childcare services for the Odegards' three children and

2

helped Miriam with other household tasks on an as-needed basis. During this time, Kishpaugh and Miriam developed a friendship, and the Odegards trusted Kishpaugh in their home and with their children.

In June of 2009, John—who is employed as an international product manager for a large, multinational corporation with its North American headquarters located in Indianapolis, Indiana—received a one-year job assignment in Mannheim, Germany. After it was decided that the entire family would relocate to Germany for one year, the Odegards made arrangements for caretakers to maintain and safeguard their property in Indiana. Aware that Kishpaugh's lease was about to end, Miriam asked Kishpaugh if she would be interested in renting their Indianapolis home during their absence. On August 21, 2009, the Odegards and Kishpaugh executed the Lease, under which Kishpaugh agreed to rent the Odegards' home from October of 2009 through August of 2010 for a monthly rate of $300. In addition to maintaining their house and yard, the Odegards instructed Kishpaugh to forward their mail and to drive their minivan around the block once a week to keep it in good working order.

In early September 2009, a few weeks prior to the Odegards' departure, Kishpaugh moved into the Odegards' home. With assistance from Miriam, Kishpaugh moved her possessions into the guest bedroom and stored some of her belongings in the adjacent walk-in attic. At the end of September, the Odegards left for Germany.

Because of the temporary nature of their relocation, the Odegards left their furniture and most of their personal possessions in their Indianapolis home. Even the family dog, Abby (Abby), stayed behind. Pursuant to the Lease, Kishpaugh agreed to "care for" Abby,

3

including "feeding, water[ing], walking, administering all medicines, transportation for any vet visits, and any other care necessary." (Appellant's App. p. 33). At some point during the fall of 2009, Kishpaugh sent an email message to the Odegards explaining that she was having a problem with Abby urinating in the living room and that she had "clean[ed] it up to the best of what I could do." (Transcript p. 251). In response, Miriam advised Kishpaugh to put Abby in her crate before leaving the house. Then, in January of 2010, Indianapolis neighbors contacted the Odegards to inform them that Abby had been left outside and was barking.

On March 25, 2010, the Odegards discovered an unauthorized charge on their bank statement. According to the bank's customer claims department, Miriam's debit card had been used the previous day to purchase $2,716.40 worth of jewelry in Egypt. Prior to leaving Indianapolis, Miriam placed a duplicate debit card in a ceramic breadbox in her kitchen in the event of an emergency or that she lost her original card. After realizing that their account had been depleted, Miriam contacted Kishpaugh and asked her to check the breadbox for the debit card. Kishpaugh informed Miriam that she found a corporate credit card in John's name and a gift card, but the duplicate debit card was missing. The bank refunded the fraudulent charges to the Odegards' account, and while it was never conclusively established how Miriam's card had been compromised, the Odegards were suspicious of the fact that Kishpaugh's ex-husband has Egyptian ties.

In mid-April of 2010, Miriam notified Kishpaugh that John would be returning to Indianapolis for a few days for business meetings. At this time, Miriam learned that Kishpaugh had been sleeping in the master bedroom since November 2009, but Kishpaugh

4

explained that she would return to the guest bedroom during John's stay. Even though John stayed at the house, he did not want to encroach upon Kishpaugh's space. As such, he left the house early, returned late, and ate all of his meals elsewhere. In addition to his limited presence in the home, John's jet lag and recent onset of shingles symptoms deterred him from conducting a thorough inspection of the property. Besides noting an unusual odor, John had no other immediate concerns about the house. However, John did observe that the garage door had been damaged, appearing as though a vehicle had been backed into it, and that the minivan's tire had been replaced with a spare. John did not discuss these issues with Kishpaugh. Instead, after John returned to Germany, Miriam questioned Kishpaugh about the damages. Regarding the garage door, Kishpaugh stated, "Umm...[I] thought that was something you guys did...[I] noticed it shortly after you left!" (Appellant's App. p. 78 (ellipses in original)). As to the minivan's tire, Kishpaugh explained that "[a] friend of mine was following me, after she helped me go get my rental car...so she was driving...the curb in the sub[]division got hit...no major speed just got hit." (Appellant's App. p. 76 (ellipses in original)).

Prior to leaving Indianapolis, the Odegards had arranged for their neighbor, Chip Miller (Chip), to maintain their property in Brown County, Indiana. Every four to six weeks thereafter, Chip informed Kishpaugh that he would be stopping by the house to retrieve the Odegards' Jeep and chainsaw for his trip to Brown County. In May of 2010, Chip discovered that the Odegards' chainsaw was missing from their garage. That same day, Chip also observed that the Odegards' minivan was gone despite the fact that Kishpaugh was at the house. When Chip asked Kishpaugh if she knew the chainsaw's

whereabouts, Kishpaugh answered, "I don't know what you're talking about. I've never seen a chain[]saw." (Tr. p. 91). Chip relayed his concerns about the missing chainsaw and minivan to the Odegards. Also around this time, the Odegards learned that Kishpaugh had not taken Abby to the veterinarian, so Chip took Abby for her check-up and shots. Miriam subsequently arranged for Abby to be boarded at a kennel until their return from Germany at a cost of $300.

On May 8, 2010, Kishpaugh notified the Odegards that she had encountered "some major financial problems" and could no longer afford to pay $300 in rent. (Appellant's App. p. 74). Kishpaugh requested a reduction of the rent to $150 or, in the alternative, an early Lease termination so that she could move in with her parents. On May 20, 2010, the Odegards informed Kishpaugh that they could not accept a lower rent and agreed to release her from the Lease. With the assistance of her parents, Kishpaugh moved her possessions out of the Odegards' home, and on May 31, 2010, she officially vacated the premises. At the Odegards' request, Chip arranged to collect the house keys from Kishpaugh. When Kishpaugh did not appear at the designated meet time, Chip used the keyless entry code to access the house through the garage and found that Kishpaugh had left the keys on the kitchen counter.

Concerned about their dog and their property, the Odegards left Germany and returned to Indianapolis on June 12, 2010—more than two months earlier than they had planned. An inspection of their house and yard quickly verified the Odegards' concerns. Although the front yard had been mowed, the grass in the back yard was three feet high, and a section of the wooden fence was "badly charred." (Tr. p. 72). The carpet in the

6

sunroom had cigarette burns. Inside, the house was filthy and smelled strongly of cigarette smoke and urine. Throughout the house, the carpet was saturated with dog urine and other "strange stain[s]." (Tr. p. 65). The microwave handle and two lamps were broken. In the guest bedroom, the Odegards found a cigarette package and cigarette burns in the carpet. There were gouges and scuff marks on the walls, and several pieces of furniture were likewise damaged. The mattresses in both the guest and master bedrooms were saturated with urine. Even in the children's bedrooms, the carpet was stained, there was a cigarette burn in an upholstered cushion, and a wire had been fed through a newly-drilled hole in the closet ceiling to equip the room for cable television.

The Odegards also noted significant damage to their minivan. During his brief trip to Indianapolis a few months earlier, John had taken the damaged tire to be repaired. Now, however, the Odegards realized that the speakers in the minivan were blown, the carpet was ripped, there were cigarette burns in the dash, and there were dents and scratches on the exterior. Kishpaugh's permission to use the minivan was limited to a weekly drive around the block and the one occasion that she needed to pick up a rental vehicle; yet, the odometer indicated that the minivan was driven 7,000 miles during the Odegards' absence. In addition to the damages to their home and minivan, the Odegards also discovered that some of their personal property was missing. Along with the previously identified missing debit card and chainsaw, Miriam's Ohio State University class ring, valued at $400; a diamond and sapphire ring, valued at $300; a vacuum cleaner, valued at $220; John's rare coin collection, valued at $18,639.04; and three other jars of coins had been removed from the home.

7

Neighbors informed the Odegards that during their time abroad, a PT Cruiser had regularly been parked in the driveway. The PT Cruiser belonged to Kishpaugh's friend, Asia Cox (Asia). After the Odegards also found mail addressed to Asia in their mailbox, a job application, and homework that Asia left on their printer, the Odegards realized that Asia had been living in their home with Kishpaugh.

On June 16, 2010, the Odegards reported the damage and theft of their property to the Indianapolis Metropolitan Police Department. Police officers were able to locate and recover the Odegards' chainsaw from a pawn shop where Asia's sister was employed. On July 26, 2010, the Odegards filed a Complaint, which they amended on March 28, 2012, alleging that Kishpaugh was liable for damages arising from her breach of the Lease, theft, violation of the Tenant Statute, and criminal mischief. On February 24, 2012, Kishpaugh filed a motion for partial summary judgment on the issue of theft, which the trial court denied on April 10, 2012.

On September 5, 2013, the trial court conducted a bench trial. At the close of the Odegards' case-in-chief, Kishpaugh moved for an involuntary dismissal pursuant to Indiana Trial Rule 41(B), which the trial court denied.[1] On October 18, 2013, the trial court entered its Judgment and, at Kishpaugh's request, issued specific findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A). The trial court ruled in favor of Kishpaugh on the issue of criminal mischief, finding the Odegards had not met their burden

---

[1] During the bench trial, Kishpaugh actually moved for a directed verdict (judgment on the evidence) at the close of the Odegards' case-in-chief. *See* Ind. Trial Rule 50. However, because the cause was not tried before a jury, it must be treated as a motion for involuntary dismissal under Indiana Trial Rule 41. *See Plesha v. Edmonds ex rel. Edmonds*, 717 N.E.2d 981, 985 (Ind. Ct. App. 1999), *trans. denied.*

of proof; however, the trial court ordered Kishpaugh to pay the Odegards a total of $85,889.36 for damages related to Kishpaugh's breach of the Lease, theft, and violation of the Tenant Statute. On November 12, 2013, Kishpaugh filed a motion to correct error, which the trial court denied on December 6, 2013.

Kishpaugh now appeals. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

I. *Standard of Review*

At Kishpaugh's request, the trial court entered findings of fact and conclusions thereon. Pursuant to Indiana Trial Rule 52(A), our court will not set aside the trial court's factual findings or its judgment "unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." When a trial court issues specific findings and conclusions, our standard of review is two-tiered: first, we consider whether the evidence supports the findings; second, we determine whether those findings support the trial court's judgment. *MCS LaserTec, Inc. v. Kaminski*, 829 N.E.2d 29, 34 (Ind. Ct. App. 2005). We will construe the trial court's findings liberally in a favor of the judgment and will find clear error only if "a review of the record leaves us firmly convinced that a mistake has been made." *Id.* The judgment is clearly erroneous if "the findings of fact and conclusions thereon do not support it, and we will disturb the judgment only when there is no evidence supporting the findings or the findings fail to support the judgment." *Id.* We do not reweigh evidence or assess the credibility of witnesses, and we consider all of the evidence in a light most favorable to the trial court's judgment. *Id.*

9

## II. *Theft*

Kishpaugh claims that the trial court's Judgment is clearly erroneous because the findings of fact and conclusions thereon are insufficient to support a determination that she committed theft. Pursuant to the Indiana Crime Victims Relief Act (Relief Act), an individual who "suffers a pecuniary loss as a result of a [theft] may bring a civil action against the person who caused the loss." Ind. Code § 34-24-3-1. A person commits theft when he or she "knowingly or intentionally exerts unauthorized control over property of another person, with intent to deprive the other person of any part of its value or use." I.C. § 35-43-4-2(a). Although the Relief Act provides that crime victims may recover three times the amount of their actual damages (treble damages), the costs of the action, and reasonable attorney fees, the amount of any award is ultimately left to the discretion of the trial court. *MCS LaserTec, Inc.*, 829 N.E.2d at 35. Because this is a civil—rather than a criminal—action, the Odegards "must merely prove commission of the crime by a preponderance of the evidence." *Sapp v. Flagstar Bank, FSB*, 956 N.E.2d 660, 667 (Ind. Ct. App. 2011).

In this case, the trial court concluded that

[c]ircumstantial evidence supports a reasonable inference that . . . Kishpaugh was guilty of theft as a princip[al] or an accomplice where she was not authorized by the Odegards to exert control over the property in the manner she did, she had access to the property while the Odegards were in Germany, and the property was missing upon the Odegards[']return.

(Appellant's App. p. 8). As a result, the trial court determined the Odegards were entitled to treble damages for their pecuniary loss resulting from Kishpaugh's theft. Upon the Odegards' request for only two—rather than three—times the amount of their actual

10

damages, the trial court awarded $39,118.08 in actual damages and $25,592.75 for attorney fees, totaling $64,710.84.[2]

## A. *Gap in Possession*

Kishpaugh contends that the trial court's "findings regarding the important issue of when the Odegards returned home" are clearly erroneous. (Appellant's Br. p. 8). The uncontroverted evidence establishes that the Odegards returned to Indianapolis on June 12, 2010. However, one of the trial court's findings states that the Odegards "permanently returned to their home" on May 31, 2010. (Appellant's App. p. 5). According to Kishpaugh, this error is significant because it "fail[s] to recognize the gap in time between when . . . Kishpaugh surrendered her leasehold interest and left the premises on May 31st and the time that the Odegards personally arrived back at the house on June 12th." (Appellant's Br. p. 9). During the bench trial, Kishpaugh maintained that any and all theft and property damage must have occurred during this twelve-day gap.

Although we agree with Kishpaugh that the trial court's finding is technically inaccurate, we decline to find such error to be fatal to the Judgment. The trial court also found that "Kishpaugh occupied and had exclusive control of the Odegards' home between October 1, 2009 and May 31, 2010." (Appellant's App. p. 5). From this finding, and considering the trial court's Judgment, we can reasonably infer that the trial court found that the Odegards' property was damaged and stolen during the timeframe that Kishpaugh

---

[2] We note that the sum total of the actual damages and attorney fees is actually $64,710.83. Unsurprisingly, neither party has challenged the one-cent discrepancy in the trial court's calculation.

had exclusive possession of the premises—*i.e.*, prior to May 31, 2010. Thus, the trial court's erroneous finding does not warrant reversal.

## B. *Circumstantial Evidence*

Kishpaugh also contends that the trial court's conclusion that there is sufficient circumstantial evidence to prove theft is clearly erroneous because the trial court "did not make any findings regarding the manner in which [Kishpaugh] actually committed such alleged theft[,] . . . what items she allegedly stole, when such items were stolen[,] or even with whom she allegedly acted." (Appellant's Br. p. 10). In turn, the Odegards argue that the "pattern of property being taken from the Odegard home as well as damage to the Odegard[s'] property[,] . . . along with . . . Kishpaugh's financial need, . . . access to such property, . . . opportunity[,] and motive" sufficiently establish Kishpaugh's guilt. (Appellees' Br. p. 10).

It is well established that "[a] judgment based on circumstantial evidence will be sustained if the circumstantial evidence alone supports a reasonable inference of guilt." *Buntin v. State*, 838 N.E.2d 1187, 1189-90 (Ind. Ct. App. 2005). Whereas "[d]irect evidence immediately establishes the main fact to be proved[,] circumstantial evidence immediately establishes collateral facts from which the main fact may be inferred." *Nichols v. State*, 591 N.E.2d 134, 136 (Ind. 1992). "'It is not necessary that the court find the circumstantial evidence excludes every reasonable hypothesis of innocence. It need only be demonstrated that inferences may reasonably be drawn which support the finding of guilt.'" *Thompson v. State*, 804 N.E.2d 1146, 1150 (Ind. 2004) (quoting *Metzler v. State*, 540 N.E.2d 606, 609 (Ind. 1989)).

In support of its conclusion that Kishpaugh committed the theft, the trial court made the following findings:

> 16.     When the Odegards left for Germany[,] the following personal property was at the residence:  Miriam Odegard's Ohio State class ring and a diamond and sapphire ring located in the master bedroom; a Debit Credit Card in Miriam Odegard's name located in the office portion of the kitchen; a vacuum cleaner; a chainsaw located in the garage[;] contents of jars of coins located in the master bedroom, kitchen and laundry room; and John Odegard's coin collection hidden in a wine box in the walk-in attic.
>
> * * * *
>
> 18.     Ms. Kishpaugh [accessed] the bread box where the Debit Credit Card was located . . . prior to and after the card's unauthorized use in Egypt.  Ms. Kishpaugh testified that she was the only person who went in the attic.
>
> 19.     Upon returning home, the Odegards found the remainder of the personal property described above missing.

(Appellant's App. p. 7).  In addition to the trial court's findings, which demonstrate that Kishpaugh had exclusive control over the premises when the property disappeared and that she had rifled through the specific areas where the stolen items were stored, we find additional circumstantial evidence in the record supports the trial court's conclusion.

Miriam's two rings were stolen from her jewelry box in the master bedroom. Despite the Odegards' understanding that Kishpaugh would be sleeping in the guest bedroom, Kishpaugh moved into the master bedroom a few months after the Odegards left for Germany.  Kishpaugh testified that she removed the Odegards' clothing from their dresser drawers and bureaus in order to make space for her own wardrobe, stowing the Odegards' items in the closet.  Given her apparent comfort with rummaging through the intimate spaces of others, it is not unreasonable to infer that she likewise searched through Miriam's jewelry box.  Also, Kishpaugh's testimony that she used the Odegards' vacuum

13

on one occasion but, because it was broken, used her own vacuum thereafter places the vacuum in Kishpaugh's exclusive control at the time it was stolen. Similarly, John's rare coin collection was stored inside a nondescript cardboard box in the attic. With the Odegards' permission, Kishpaugh had stored some of her furniture and other boxes in the attic. Kishpaugh explained that she accessed the attic on multiple occasions to retrieve seasonal clothing and also to search for the Odegards' Christmas decorations.

The Odegards' stolen possessions were not overtly valuable, and they were stored out of sight. Thus, the perpetrator had to probe through the house for items that would not be readily identified as missing—undoubtedly a time-consuming process. Furthermore, the items that were stolen were of a nature that they could be easily pawned or exchanged for cash. In fact, the chainsaw was actually recovered from a pawn shop, and it is undisputed that the chainsaw was sold to that pawn shop during Kishpaugh's tenancy. The evidence indicates that Kishpaugh was struggling financially; she could no longer afford to pay rent, and she testified that her unemployment compensation benefits had run out. It is thus reasonable to infer that Kishpaugh pilfered the items that were at her immediate disposal in order to meet her financial needs.

Kishpaugh also argues that the Odegards failed to satisfy their burden of proof as to each element of theft. According to Kishpaugh, the trial court's "conclusion was expressed in such amorphous and general terms[] [that] it appears that the [t]rial [c]ourt either effectively imposed a strict liability standard on . . . Kishpaugh concerning any property later found missing, or that the [t]rial [c]ourt actually placed the burden of proof on . . . Kishpaugh to prove her innocence." (Appellant's Br. p. 17). The Odegards were required

14

to prove by a preponderance of the evidence that Kishpaugh knowingly or intentionally exerted unauthorized control over their property with the intent to deprive them of its value or use. I.C. § 35-43-4-2(a). Preponderance of the evidence "simply means the 'greater weight of the evidence.'" *Travelers Indem. Co. v. Armstrong*, 442 N.E.2d 349, 361 (Ind. 1982) (quoting *Great Atl. & Pac. Tea Co. v. Custin*, 13 N.E.2d 542, 545 (Ind. 1938), *reh'g denied*).

In this case, the bulk of the evidence consisted of the parties' testimony. As such, the evidence was certainly subject to conflicting inferences, but our sole concern on review is to determine "whether the inferences supporting the judgment were reasonable, not whether there were other 'more reasonable' inferences that could have been made." *Brink v. State*, 837 N.E.2d 192, 197 (Ind. Ct. App. 2005) (quoting *Thompson*, 804 N.E.2d at 1150), *trans. denied*. Our court does not interfere with the trial court's role in weighing the evidence and assessing the credibility of witnesses, and, here, the trial court's decision essentially turned on a determination of which party offered more reliable testimony. We find that it was entirely reasonable for the trial court to credit the Odegards' testimony over that of Kishpaugh, especially in light of Kishpaugh's incriminatory admission that she had been collecting unemployment compensation benefits from the State of Indiana while failing to report other income. Accordingly, we agree with the trial court that the greater weight of the evidence establishes that while Kishpaugh was supposed to be acting as a custodian for the Odegards' home and belongings, she instead exerted unauthorized control

over their property. As a result, she must pay the Odegards treble damages for depriving them of the value of their property.[3]

### III. *Treble Damages as Non-Dischargeable Debt*

Kishpaugh next claims that the trial court lacked the "jurisdiction to determine whether or not any obligation imposed from [her] alleged theft is dischargeable in bankruptcy." (Appellant's Br. p. 21). Although the record does not indicate that Kishpaugh has filed or intends to file for bankruptcy, the trial court concluded that theft is "within the exceptions for discharge in bankruptcy under 11 U.S.C. § 523(a)(4)." (Appellant's App. p. 9). Pursuant to the United States Bankruptcy Code, an individual debtor may not discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or *larceny*." 11 U.S.C. § 523(a)(4) (emphasis added).

The United States Supreme Court has determined that the dischargeability of a debt is "an issue that Congress intended the bankruptcy courts, rather than the state courts, to decide." *Klingman v. Levinson*, 831 F.2d 1292, 1294 (7th Cir. 1987) (citing *Brown v. Felsen*, 442 U.S. 127, 136 (1979)). Nevertheless, Kishpaugh acknowledges that "in limited and very specific instances[,]" a state court has "concurrent jurisdiction with federal courts to determine what debts constitute non-dischargeable debts." (Appellant's Br. pp. 21-22).

---

[3] Having found sufficient evidence to support Kishpaugh's liability for theft as a principal, we do not address her argument that the evidence and findings are insufficient to establish accomplice liability. In addition, Kishpaugh has raised three other claims—that the trial court erred by denying her motion for involuntary dismissal, her motion for partial summary judgment, and her motion to correct error. However, because Kishpaugh did not support any of these three arguments with cogent reasoning or citations to authority, we find that Kishpaugh has waived these claims for appellate review. Ind. Appellate Rule 46(A)(8)(a)-(b). It is not sufficient for the argument section that an appellant simply recites facts and makes conclusory statements without analysis or authoritative support.

*See Carey v. Carey*, 733 N.E.2d 14, 16 (Ind. Ct. App. 2000). However, because the trial court's challenged conclusion does not concern "'maintenance and support' under 11 U.S.C. § 523(a)(5)," Kishpaugh maintains that *only* a bankruptcy court can decide whether her obligation to pay the Odegards' treble damages is a non-dischargeable debt. (Appellant's Br. p. 22). On the other hand, the Odegards argue that the trial court did not commit reversible error because bankruptcy courts may "be guided by considerations of a state court[] and law in its determination." (Appellees' Br. p. 11).

Notwithstanding the bankruptcy court's exclusive jurisdiction, a state court's findings may "have collateral estoppel application in any subsequent nondischargeability proceeding." *In re Guy*, 101 B.R. 961, 974 (N.D. Ind. 1988). The Seventh Circuit Court of Appeals has resolved that "[w]here a state court determines factual questions using the same standards as the bankruptcy court would use, collateral estoppel should be applied to . . . bar relitigation of an issue determined by a state court." *Klingman*, 831 F.2d at 1295. Collateral estoppel requires:

> 1) the issue sought to be precluded must be the same as that involved in the prior action, 2) the issue must have been actually litigated, 3) the determination of the issue must have been essential to the final judgment, and 4) the party against whom estoppel is invoked must be fully represented in the prior action.

*Id.*

We do not now decide whether collateral estoppel applies to the trial court's conclusion. Rather, it is the role of the bankruptcy court to review the record and analyze whether the state law elements of Kishpaugh's theft also satisfy the larceny prong for a non-dischargeable debt under 11 U.S.C. § 523(a)(4). *See In re Luedtke*, 429 B.R. 241, 251-

17

52 (N.D. Ind. 2010). Accordingly, unless a bankruptcy court rules that the trial court's Judgment has preclusive effect, the trial court's conclusion that Kishpaugh's treble damages are a non-dischargeable debt is inconsequential. Because the trial court's conclusion is not binding, we agree with the Odegards that its inclusion in the Judgment does not amount to reversible error.

## IV. *Breach of the Lease*

Kishpaugh claims that the trial court erred in its conclusion that "[t]he Odegards are entitled to compensatory losses and damages to their mini[]van, boarding of Abby, and damages and repairs to the interior of their home, as well as attorney[] fees" resulting from Kishpaugh's breach of the Lease. (Appellant's App. p. 8). In particular, Kishpaugh contends that the evidence does not establish that she "proximately or actually caused" any damage to the Odegards' home or minivan. (Appellant's Br. p. 23). For the cigarette smoke and urine odors, as well as damages to the walls, carpet, furniture, appliances, garage door, and minivan, the trial court ordered Kishpaugh to pay the Odegards $12,510 in actual damages and $8,668.52 in attorney fees, for a total award of $21,178.52.

In a breach of contract claim, the plaintiff bears the burden of proving (1) that a contract existed; (2) that the defendant breached said contract; and (3) that the plaintiff sustained damages as a result of the breach. *Collins v. McKinney*, 871 N.E.2d 363, 370 (Ind. Ct. App. 2007). In part, the Lease stipulated:

> [Kishpaugh] shall, at [Kishpaugh's] expense maintain the Premises and furnishings in clean and satisfactory condition, and shall return them to the [Odegards] in that condition at the expiration of this Lease.
>
> * * * *

18

[Kishpaugh] will occupy and use the Premises for [Kishpaugh's] private residence and for no other purpose. The Premises will be occupied by no more than [two] person(s). No roomers, lodgers, or boarders shall be permitted to occupy the Premises with [Kishpaugh] and no guest(s) shall be allowed to occupy the Premises for more than three (3) days in any given month without the prior written consent of [the Odegards].

* * * *

[Kishpaugh] agrees to care for all [of the Odegards'] pets. This includes feeding, water, walking, administering all medicines, transportation for any vet visits, and any other care necessary. All pets must stay on the property, unless on a leash. [Kishpaugh] agrees to work with any trainer, as [the Odegards] deem[] necessary.

(Appellant's App. pp. 31, 33). The trial court determined that Kishpaugh had breached the Lease because "she soiled the mattresses, left cigarette burns on the carpets, caused marks on the walls, put holes in the walls, allowed the family pet, Abby, to defecate on the carpets, allowed guests to occupy the Premises, and drove and caused damage to the Odegard[s'] mini[]van." (Appellant's App. p. 8).

In asserting that she did not breach the Lease because the damages were sustained after she moved out, Kishpaugh relies on her own testimony during the bench trial that she cleaned the house prior to moving out, as well as the testimony of her mother, who stated that "it was obvious that [the house] was clean" at the time she helped move Kishpaugh's furniture out of the attic. (Tr. p. 291). The Odegards, however, testified as to the clean condition of their home, yard, and minivan at the time they left for Germany and also presented evidence depicting the extensive damages that were awaiting them upon their return to Indianapolis. The Odegards further presented evidence indicating that Kishpaugh had permitted Asia to live in their house and to drive (and damage) their minivan. The Odegards also explained that they had not previously experienced difficulties with Abby

19

barking while outdoors or urinating in the house, but Kishpaugh's lack of attention to Abby's needs required them to board her in a kennel for one month.

Kishpaugh's argument is essentially a request that we disregard the trial court's role in weighing evidence and evaluating the witnesses' credibility by giving credence to her version of events. This we will not do. Moreover, we find that the evidence and reasonable inferences support the finding that Kishpaugh breached the Lease. The trial court heard the evidence that neither John nor Chip detected the damages when they were inside the house during Kishpaugh's occupancy, but the trial court also heard evidence that neither of them inspected the premises. Contrary to Kishpaugh's contention that the carpet was soiled before she even moved in, the Odegards presented documentation to show that, prior to leaving for Germany, they had their carpets professionally cleaned. Kishpaugh claimed that, except for the one occasion that she had permission to use the minivan to pick up a rental car, she only drove the minivan once a week around the neighborhood. Again, the Odegards refuted this testimony by submitting a receipt for an oil change which indicated that, just prior to the Odegards' departure, the minivan's odometer reading was 7,000 miles less than after they returned. Given these fallacies in Kishpaugh's claims, we find that it was reasonable for the trial court to discredit Kishpaugh's testimony that none of the other damages existed at the time she moved out.

Like the trial court, we are unpersuaded by Kishpaugh's defense strategy that someone else must have entered the house and caused all of the damage between May 31, 2010 and June 12, 2010. Kishpaugh testified that she locked the door when she left, and there is no evidence that anybody forcefully entered the home or that the home security

20

system was triggered. Of course, it might be possible for someone to break into a house in order to install cable television in a little girl's bedroom and use the carpet as an ashtray, but the collective evidence in this case reveals that Kishpaugh and/or her guest(s) trashed the Odegards' home. We therefore conclude that there is sufficient evidence that Kishpaugh breached the Lease by failing to return the house in a clean and satisfactory condition, permitting unauthorized roomers, and failing to care for Abby.

## V. *Violation of Indiana Code Section 32-31-7-6*

Lastly, Kishpaugh claims that the trial court erred by concluding that she had violated her obligations as a tenant.[4] The Tenant Statute provides that "[a]t the termination of a tenant's occupancy, the tenant shall deliver the rental premises to the landlord in a clean and proper condition, excepting ordinary wear and tear expected in the normal course of habitation of a dwelling unit." I.C. § 32-31-7-6. If a tenant violates this duty, Indiana Code section 32-31-7-7(f) affords the prevailing landlord the right to recover actual damages, attorney fees and costs; injunctive relief; and/or "[a]ny other remedy appropriate under the circumstances."

Based on our search for any existing case law concerning the Tenant Statute, it appears that Kishpaugh has presented an issue of first impression. Where a statute has not previously been construed, our court endeavors to ascertain and give effect to the intent of the legislature. *Gee v. Green Tree Servicing, LLC*, 934 N.E.2d 1260, 1262 (Ind. Ct. App.

---

[4] Although the trial court determined that Kishpaugh's statutory violation warranted an award of actual damages, attorney fees, and costs, the trial court did not order any "additional damages" for this claim. (Appellant's App. p. 9).

2010). Thus, we look to the express language of the statute and the rules of statutory construction, reviewing the statute in its entirety under the presumption that "the legislature intended logical application of the language used in the statute, so as to avoid unjust or absurd results." *Id.* (quoting *State v. Prater*, 922 N.E.2d 746, 748 (Ind. Ct. App. 2010)).

In addition to reiterating her earlier assertion that she is not liable for any damages that were incurred during the twelve-day period between the termination of her occupancy and the Odegards' return to Indianapolis, Kishpaugh also argues that there is insufficient evidence to support the trial court's conclusion that she violated her statutory tenant obligations. Kishpaugh primarily relies on her own self-serving testimony as evidence that the Odegards' home "was actually cleaner when I left than when I arrived." (Tr. p. 262). We find that Kishpaugh's argument ultimately amounts to a request to reweigh evidence and reassess witness credibility, which we decline to do.

Furthermore, Kishpaugh concedes that she broke the lamps and the microwave handle and that Abby frequently urinated in the living room. However, she insists that these incidents "are normal events that are likely to happen over the course of several months." (Appellant's Br. p. 25). If the evidence indicated that the extent of the damage consisted of a few scuffs on the walls and some carpet stains, we would likely find Kishpaugh's argument to be more persuasive. However, such is not the case.

While the Tenant Statute certainly excludes "ordinary wear and tear" from the gamut of a tenant's potential liability, it does not operate as a license for the tenant to destroy the landlord's property. I.C. § 32-31-7-6. "Ordinary" is defined as "of a kind to be expected in the normal order of events"—that is, "routine" or "usual." MERRIAM-

22

WEBSTER, http://www.merriam-webster.com/dictionary/ordinary (last visited Sept. 4, 2014). Here, the totality of the evidence demonstrates that there was *substantial* damage *throughout* the Odegards' home, yard, and even to their minivan. "Ordinary" use of a leased space does not result in cigarette burns in the carpet and vehicle, a scorched fence, urine-soaked carpet and mattresses, a damaged garage door, and more. Therefore, we find that the evidence supports the trial court's determination that Kishpaugh failed to deliver the Odegards' property "in a clean and proper condition." I.C. § 32-31-7-6.

VI. *Appellate Attorney Fees*

On August 12, 2014, the Odegards filed their Petition for Appellate Attorney Fees. On August 18, 2014, Kishpaugh filed her objection thereto, asserting, in part, that her appeal is neither frivolous nor in bad faith as is required for an award of appellate attorney fees under Indiana Appellate Rule 66(E). Notwithstanding any frivolity in Kishpaugh's appeal, we find that the Odegards are entitled to appellate attorney fees based on general principles of contract law. *See Gershin v. Demming*, 685 N.E.2d 1125, 1131 (Ind. Ct. App. 1997).

"When a contract provision provides that attorney fees are recoverable, appellate attorney fees may also be awarded." *Humphries v. Ables*, 789 N.E.2d 1025, 1036 (Ind. Ct. App. 2003). The Lease stipulates that in the event of default by Kishpaugh, Kishpaugh "shall pay all costs and expenses, *including attorney fees*, incurred by [the Odegards] in connection with [their] exercise of any rights or remedies [they] may have under this Lease because of default." (Appellant's App. p. 32 (emphasis added)). An "Event of Default" is defined in the Lease to include a violation of "any other term, condition or covenant of this

23

Lease." (Appellant's App. p. 32). Because Kishpaugh clearly defaulted in her obligation to maintain and return the house "in [a] clean and satisfactory condition," the Odegards are entitled to recover their appellate attorney fees. (Appellant's App. p. 31). Moreover, our court has also previously held that a plaintiff who prevails under the Relief Act is entitled to appellate attorney fees. *Heartland Res., Inc. v. Bedel*, 903 N.E.2d 1004, 1008 (Ind. Ct. App. 2009). Accordingly, we remand to the trial court for a determination of reasonable appellate attorney fees.

<u>CONCLUSION</u>

Based on the foregoing, we conclude that the trial court did not err in concluding that Kishpaugh committed theft, breached the Lease, and violated the Tenant Statute. Although the trial court lacked jurisdiction to declare that the theft damages are a non-dischargeable debt in bankruptcy, we conclude that the trial court's inclusion of this conclusion in its Judgment is harmless error. In addition, we grant the Odegards' Petition for Appellate Attorney Fees and remand to the trial court to determine the amount.

Affirmed and remanded.

MATHIAS, J. and CRONE, J. concur