## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 15 2019, 10:45 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT J.M.

Jason Meredith
Monroe County Public Defender's Office
Bloomington, Indiana

ATTORNEY FOR APPELLANT D.M.

Amy P. Payne
Monroe County Public Defender's Office
Bloomington, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Matter of A.M. (Minor Child), Child in Need of Services, and

J.M. (Mother) and D.M. (Father),

*Appellants-Respondents,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

March 15, 2019

Court of Appeals Case No. 18A-JC-2330

Appeal from the Monroe Circuit Court

The Honorable E. Michael Hoff, Special Judge

Trial Court Cause No. 53C06-1708-JC-634

**Crone, Judge.**

## Case Summary

[1] J.M. ("Mother") and D.M. ("Father") (collectively "Parents") appeal the adjudication designating their daughter A.M. ("Child") a child in need of services ("CHINS"). They challenge the trial court's admission of Child's forensic interview on hearsay grounds and assert that the evidence is insufficient to support the CHINS determination. We affirm.

## Facts and Procedural History

[2] Parents are the biological parents of Child, born October 12, 2012. Child spent a portion of her first three years in relative care with B.S. due to a previous CHINS adjudication. Mother completed services, and the CHINS case was closed. When Child was four, she lived with Parents at their apartment and slept in the same bed with them.

[3] In August 2017, the Indiana Department of Child Services ("DCS") received a report that Child had accused Father of molesting her. DCS family case manager ("FCM") Catherine Hall went to Parents' apartment, accompanied by police. FCM Hall had a private conversation with Mother, while officers remained with Father and Child. According to FCM Hall, Mother did not believe Child's allegations against Father. The officers apprised Father of the allegations, and although he denied them, he packed a suitcase and left.

[4]     That same day, Child was taken to Susie's Place child advocacy center, where she underwent a forensic interview. During the interview, she disclosed that Father had touched her breasts, vagina, and buttocks while she was in bed with him and Mother. FCM Hall, a police detective, and a victim advocate observed a live feed of the interview from another room. FCM Hall subsequently had a meeting with Parents, and Mother reiterated that she disbelieved Child's allegations. FCM Hall later testified concerning her conversations with Mother,

> [W]e have some serious safety concerns if you do not believe your daughter. How can you keep your daughter safe if you do not believe her? Um, she's disclosing that her father did this and then, of course, I went through the whole of reasons of why, ah, based upon her previous history with us that she had been previously ruled as the one parent who needed help and assistance. That [Father] was the more stable parent and now he was leaving the home, she was left to do this, and then she didn't believe her daughter. At that point, we no longer felt that she could keep this child safe. So the child was removed from both their cares.

Tr. Vol. 1 at 41-42. Child was placed with B.S., who had previously adopted two of Child's older siblings.

[5]     DCS filed a petition seeking to have Child designated a CHINS. The CHINS allegations included child molesting by Father, Mother's presence during the alleged molestations, and Mother's neglect/disbelief of Child's allegations. Father was legally prohibited from visiting Child due to a protective order. Child initially had therapeutic supervised visits with Mother. The visits

temporarily ceased, but Mother filed a motion to reinstate, which the trial court granted. Mother's therapeutic supervised visits are once a week for approximately two hours.

[6] DCS sought and was granted a child hearsay hearing, seeking to introduce at the factfinding hearing the abuse disclosures that Child had made during her forensic interview. After the child hearsay hearing, the trial court concluded that Child's statements bore sufficient indications of reliability and that Child was unavailable to testify at the factfinding hearing. At the factfinding hearing, the trial court took judicial notice of other DCS orders involving Parents. These include four previous termination orders (two voluntary and two involuntary) concerning Mother's older children and one previous termination order involving Father.[1]

[7] The trial court adjudicated Child a CHINS. In an order with findings of fact and conclusions thereon, the court continued Child in her relative placement. Parents now appeal. Additional facts will be provided as necessary.

---

[1] Those termination orders are not included in the record before us.

# Discussion and Decision

## Section 1 – The trial court acted within its discretion in admitting Child's hearsay statements.

[8] Parents challenge the admission of Child's hearsay statements alleging that Father molested her. The admission of evidence is a matter entrusted to the trial court's sound discretion. *In re S.L.H.S.*, 885 N.E.2d 603, 614 (Ind. Ct. App. 2008). We will reverse an evidentiary ruling only on a showing of an abuse of discretion, meaning that the trial court's decision is against the logic and effect of the facts and circumstances before it. *Id.* "The fact that evidence was erroneously admitted does not automatically require reversal, and we will reverse only if we conclude the admission affected a party's substantial rights." *In re A.J.*, 877 N.E.2d 805, 813 (Ind. Ct. App. 2007), *trans. denied* (2008).

[9] Our General Assembly has enacted legislation geared specifically to the use of a child's hearsay statements in CHINS proceedings.[2] Indiana Code Section 31-34-13-2 provides that a statement or videotape made by a child under age fourteen is admissible as evidence in a CHINS proceeding if certain requirements are met. Indiana Code Section 31-34-13-3, known as the Child Hearsay statute, lists those requirements, reading in pertinent part,

---

[2] Parents cite the protected persons statute, Indiana Code Section 35-37-4-6, as instructive in ascertaining whether Child's statements are reliable. "The protected persons statute applies to criminal proceedings where the introduction of statements by child victims is at issue. A CHINS proceeding is civil in nature, and thus the protected persons statute is not applicable[.]" *In re J.Q.*, 836 N.E.2d 961, 964 n.1 (Ind. Ct. App. 2005).

A statement or videotape described in section 2 of this chapter is admissible in evidence in an action to determine whether a child … is a child in need of services if, after notice to the parties of a hearing and of their right to be present:

(1) the court finds that the time, content, and circumstances of the statement or videotape and any other evidence provide sufficient indications of reliability; and

(2) the child:

….

(C) is found by the court to be unavailable as a witness because:

(i) a psychiatrist, physician, or psychologist has certified that the child's participation in the proceeding creates a substantial likelihood of emotional or mental harm to the child; [or]

….

(iii) the court has determined that the child is incapable of understanding the nature and obligation of an oath.

[10]  With respect to the "time, content, and circumstances" of Child's hearsay statements, Parents appear to limit their argument to the reliability of the content. That said, we note that Child underwent her forensic interview the same day that her allegations were reported to DCS and that the interview was conducted in a neutral setting, using nonleading questions. Parents claim that Child's inability to recall when or how often she was molested renders her hearsay statements unreliable. We disagree. Although Child could not recall

when the incidents began and ended, she disclosed that she was molested more than once, and forensic interviewer Kelly Hunkler explained that Child's inability to pinpoint the timeframe or frequency of the alleged molestations was typical for a four-year-old. *See* Tr. Vol. 1 at 60 (testimony that "a four year old can typically tell you the who, the what, and the where, but they're not so good at sequence or when."). When asked if there was "anything atypical about the way [Child's] interview went," Hunkler responded, "No." *Id.* at 61.

[11] Parents also point to the lack of specificity of some of Child's responses. For example, Child did not use clinical or mature terms for body parts. However, she could identify body parts that Father had allegedly touched. Similarly, Child did not specify whether the fondling took place over or underneath her pajamas. However, she did disclose that she never wore a pajama top or underwear to bed and that she sometimes woke up without her pajama bottoms. Parents both corroborated the information concerning Child's nighttime attire and the fact that she slept in their bed with them.

[12] Parents also contend that Child's statements were unreliable because she could not tell the difference between the truth and a lie. Hunkler testified as to this issue in part,

> When I spoke with [Child] I asked her that if we could agree to only talk about things that were real and that really happened, so that's things that she experienced, um, that she heard with her ears, saw with her eyes, tasted with her mouth, smelled with her nose or felt with her body and that I asked her, um, we could

agree to only talk about things that really happened and she agreed.

*Id.* at 59.  Hunkler further explained that Child's statements were consistent throughout the interview, though not particularly detailed, which is typical for a child her age.  *Id.* at 60-61.

[13]     With respect to reliability, Parents also focus on information provided by psychologist Dr. Julia Gadlage, who conducted a clinical assessment and testified at the child hearsay hearing.  Dr. Gadlage was specifically tasked with ascertaining whether Child would be deemed unavailable to testify at the upcoming factfinding hearing.  Parents do not challenge the issue of Child's unavailability pursuant to the statute, but they cite the doctor's findings as they relate to the issue of reliability.  In her written report, Dr. Gadlage explained that Child did "not have the ability to understand the nature and obligation of an oath."  DCS Ex. A at 11.  At the child hearsay hearing, she testified that when she questioned Child concerning Father or any past abuse, Child either ignored her completely or said, "I don't know."  Tr. Vol. 1 at 77.  She described Child as emotionally unstable and fragile, with trauma symptoms resembling post-traumatic stress disorder.  *Id.* at 78-79.  She expressed concern that Child could not verbalize the difference between the truth and a lie but found that Child could "describe prior things that have happened to her."  *Id.* at 91.

[14]     Parents essentially contend that Child's lack of understanding of certain terms makes her reliability impossible to discern, even for professionals.  We disagree.  Parents' argument is tethered to semantics, that is, whether Child can apply

terms such as oath, truth, and lie, without regard to her tender age. We find such an application to be rigid and unpersuasive. The information provided by Hunkler and Dr. Gadlage shows Child's statements to be sufficiently reliable for a four-year-old child. As such, we find no abuse of discretion in the admission of Child's hearsay statements.

## Section 2 – The evidence is sufficient to support the CHINS determination.

[15] Parents also challenge the sufficiency of the evidence to support the CHINS determination. When reviewing the sufficiency of evidence, we give due regard to the trial court's ability to assess the credibility of witnesses. *In re Des.B.*, 2 N.E.3d 828, 836 (Ind. Ct. App. 2014). We neither reweigh evidence nor judge witness credibility; rather, we consider only the evidence and reasonable inferences most favorable to the trial court's decision. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012). Where the trial court issues findings of fact and conclusions thereon, we apply a two-tiered standard of review. *In re R.P.*, 949 N.E.2d 395, 400 (Ind. Ct. App. 2011). We consider first whether the evidence supports the findings and then whether the findings support the judgment. *Id*. We will set aside the trial court's findings and conclusions only if they are clearly erroneous and a review of the record leaves us firmly convinced that a mistake has been made. *Id*. Appellate courts generally grant latitude and deference to trial courts in family law matters. *Matter of E.K.*, 83 N.E.3d 1256, 1260 (Ind. Ct. App. 2017), *trans. denied* (2018). This deference recognizes the trial court's "unique ability to see the witnesses, observe their demeanor, and

scrutinize their testimony, as opposed to this court's only being able to review a cold transcript of the record." *Id*.

[16] In a CHINS proceeding, DCS bears the burden of proving by a preponderance of the evidence that a child meets the statutory definition of a CHINS. *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010). To meet its burden of establishing CHINS status, DCS must prove that the child is under age eighteen,

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
>> (A) the child is not receiving; and
>>
>> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

Ind. Code § 31-34-1-1.

[17] Although the acts or omissions of one or both parents can cause a condition that creates the need for court intervention, the CHINS designation focuses on the condition of the children rather than on an act or omission of the parent(s). *N.E.*, 919 N.E.2d at 105. In other words, despite a "certain implication of parental fault in many CHINS adjudications, the truth of the matter is that a CHINS adjudication is simply that – a determination that a child is in need of services." *Id*. (citations omitted).

[18] Parents do not specifically challenge any of the court's findings. As such, we simply determine whether the unchallenged findings are sufficient to support the judgment. *T.B. v. Ind. Dep't of Child Servs.*, 971 N.E.2d 104, 110 (Ind. Ct. App. 2012), *trans. denied*. The unchallenged findings include the following:[3]

> 2. On or about August 6, 2017, Child disclosed that she had been sexually molested when Father fondled her in Parents' bed, where Mother, Father and Child were sleeping. During the DCS investigation of the allegations the Mother informed the DCS that she did not believe that Father had fondled Child. The DCS concluded that Child was unsafe in Parents' home as Father had molested her, and Mother was unlikely to protect Child since Mother did not believe the child abuse had happened.

> 3. Child was removed from Parents['] home on August 6, 2017, and placed in a kinship placement in the home of B.S. Child has resided continuously in the home of B.S. since her removal from Parents' home. Also residing in that home are [two of] Child's half siblings, …. the biological children of Mother.

> 4. Mother previously voluntarily terminated her parental rights to two of her children. In December, 2009, the parental rights of Mother as to two other children who were biological siblings of Child were involuntarily terminated.

> 5. The parental rights of Father as to one child who was a biological sibling of Child w[ere] involuntarily terminated.

> 6. Child's care was the subject of an open DCS case in Monroe County from 2012 through 2016. The case was closed after

---

[3] The findings include proper names. We refer to the relevant persons as previously designated.

Mother successfully complied with the steps required of her by the DCS.

7. The Court previously found in the June 11, 2018 Order Finding Child to be in Need of Services that the CHINS petition had been proven by the greater weight of the evidence; that Father had sexually molested Child as set out in the CHINS petition; that Mother does not believe that the illegal fondling of Child by Father occurred; and Mother is in a poor position to protect Child from further harm. The Court further found that because Mother does not believe Child's report of Father fondling her, Mother is unwilling or unable to keep Child safe. She is not capable of caring for Child without assistance. The Court reaffirms those findings.

8. Child needs a safe home environment that cannot be provided by Parents. She should remain in the current foster home placement with B.S. She needs appropriate outpatient treatment from an individual mental health practitioner. She requires supervised visitation with Mother and transportation to and from that visitation. She should not have contact with Father unless and until it is recommended by the family team, and then any contact should be supervised. The Court notes that there is at this time a protective order entered in a criminal case that prohibits Father from having any contact with Child.

9. Because of the emergency nature of Child's situation in Parents' home, the DCS was unable to provide services as an alternative to the immediate removal of Child from Parents' home.

10. As stated in the DCS Summary of DCS Recommendations in its Predispositional Report, both parents have had extensive services provided to them. Because both parents have previously had their parental rights to other children who are biological

siblings of Child involuntarily terminated the DCS is not required to make reasonable efforts to reunify Child with Parents, or to preserve the family.

11.  It is not clear what the relationship between Parents is now. They were residing as a married couple.  When Child was removed from their home Father voluntarily moved out. However there is evidence that they continue to meet and spend time together (as they have a right to do).  Mother appears to want to continue her marital relationship as it was before Child was removed.  Father did not testify, so his intention is not known.  Keeping Child safe in a home with both her parents would be difficult and hard to assure for the reasons set out herein; Father molested her and Mother doesn't believe it.

12.  Child has been out of Parents' home for four years, and she is only five years old.  She needs stability and to know where her home is, a point emphasized by the CASA.  She should not live in Parents' home.  Some of the deficiencies in the foster home, such as cleanliness and clutter, could be improved on, but Child should remain in that home so long as it is an option for adoption/long term placement.

Appealed Order at 1-3.

[19]   These unchallenged findings stand as proven and are sufficient to support the CHINS determination.  Sadly, Mother's connection with Father and desire to work on the marital relationship, combined with her skepticism concerning Child's allegations against Father, underscore the need for the court's coercive intervention to protect Child from physical and emotional danger.  We find no error here.  Consequently, we affirm.

Affirmed.

Vaidik, C.J., and Mathias, J., concur.