## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 23 2019, 6:47 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT
P.P. (GUARDIAN)

Roberta L. Renbarger
Fort Wayne, Indiana


ATTORNEY FOR APPELLANT
S.P. (GUARDIAN)

Timothy E. Stucky
Stucky, Lauer & Young, LLP
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of:
L.S. and M.S. *(Minor Children)*
*Children in need of Services*

and

P.P. and S.P. (Guardians),

*Appellants-Respondents,*

v.

The Indiana Department of
Child Services,

*Appellee-Petitioner.*

August 23, 2019

Court of Appeals Case No.
19A-JC-264

Appeal from the Allen Superior
Court

The Honorable Cynthia Amber,
Judge Pro Tempore

The Honorable Sherry A. Hartzler,
Magistrate

Trial Court Cause No.
02D08-1710-JC-682
02D08-1710-JC-683

**Robb, Judge.**

# Case Summary and Issue

[1] S.P. and P.P. ("Guardians") appeal the juvenile court's determination that the minor children in their care, L.S. and M.S. ("Children"), are children in need of services ("CHINS"). Guardians raise the sole issue of whether the Allen County Department of Child Services ("DCS") presented sufficient evidence supporting the juvenile court's determination. Concluding there was sufficient evidence to support the juvenile court's judgment, we affirm.

# Facts and Procedural History

[2] C.P. and D.S. ("Parents") are the biological parents of L.S., born November 30, 2005, and M.S., born April 20, 2007. S.P. and her husband, P.P., began caring for the Children, who are the nieces of their daughter-in-law, when L.S. was two and one-half years old and M.S. was fifteen months old. Eventually, Guardians were granted joint legal custody of the Children.[1] Both of the Children suffer from fetal alcohol developmental issues and attention-

---

[1] The exact details surrounding the events leading to Guardians obtaining custody of the Children are unclear.

deficit/hyperactivity disorder. In addition, L.S. has been diagnosed with autism and reactive attachment disorder.[2]

[3] Guardians first became involved with DCS in 2015 and entered into an informal adjustment to address the Children's educational needs. The Children were enrolled in public school because DCS was involved and upon closure of the informal adjustment, Guardians removed the Children from school. DCS most recently became involved with the family in September 2017 due to allegations that the Children were not receiving proper schooling and the conditions of Guardians' home were unsuitable and unsanitary – specifically, that the home was extremely dirty, contained maggots and rats, and that Guardians were hoarding items.

[4] DCS investigator Sara Murriel visited the home on September 28, 2017, and observed the condition of the home. Boxes were piled shoulder-high in nearly every room of the house leaving only a single path in most rooms, making it difficult to maneuver through the house. The kitchen smelled of old food and was filled with dirty dishes, rotten food, and canned goods that had been expired for years. A package of chicken had been left out on the kitchen counter, and Murriel observed maggots crawling on the chicken. The back patio of the house, where the family ate most of their meals, was riddled with

---

[2] Both children are missing multiple chromosomes, have sensory processing disorders, and suffer from behavioral and executive functioning issues.

"overflowing cat litter boxes" and the garage was "completely packed full of items[,]" preventing Murriel from entering. Transcript, Volume 1 at 11.

[5] In addition, the family has roughly eighteen to twenty-five cats.[3] The cats had damaged or destroyed numerous items by urinating and defecating on the items and a strong scent permeated the house. S.P. told Murriel they had recently moved into the house. At the time of the visit, S.P. also informed Murriel that she was homeschooling the Children. When Murriel asked S.P. for documentation regarding the homeschooling, S.P. was unable to provide any. The Children attended pre-kindergarten, kindergarten, and first and third grades in public school, and were homeschooled for second, fourth, and fifth grades. Prior to DCS' involvement in the instant matter, Guardians utilized numerous community resources to address the Children's special needs, attended occupational therapy, had sought medical care from roughly fifteen doctors, and took part in various social organizations and events.

[6] Based on the conditions of the home, Murriel submitted a referral for emergency services from SCAN's Intensive Intervention Team ("IIT") to help the family declutter, organize, and clean the home. The case was transferred to DCS family case manager ("FCM") Jennifer Vanstrom. In October 2017, IIT "cleaned the kitchen, mopped the floors, swept the floors, picked up, [threw away] any food that was spoiled . . ., threw away cans that didn't look right, put

---

[3] Testimony established that not all of the cats stayed inside. There is no evidence as to how many cats lived inside the home and how many lived outside.

boxes in the basement, put any items in the certain rooms where they belong[ed]." *Id*. at 88. Following IIT's assistance, SCAN home-based caseworker, Nicoma Cook, continued to assist the family in keeping the home sanitary and organized.

[7] On October 17, 2017, DCS filed its petition alleging the Children were CHINS. Following an initial hearing, the juvenile court ordered Guardians to participate in services and ordered the Children's continued placement in Guardians' home. Guardians were ordered to each complete a diagnostic assessment, enroll in home-based services, follow all recommendations, and attend and participate in a family team meeting within fourteen days and follow recommendations.

[8] The Children began meeting with a licensed family therapist and L.S. worked with a therapist from the Park Center. With respect to education, DCS coordinated with Growing Minds to provide educational and behavioral support for the Children. The Children began to work with a Growing Minds tutor in early January 2018. The sessions initially began in Guardians' home but after one or two visits, the tutor concluded the in-home environment was not conducive to learning as the Children were easily distracted by the numerous cats and clutter and unable to concentrate in the home. Therefore,

the tutor decided to work with the Children at the library where they worked on math, reading, language, and were assigned homework each night.[4]

[9] During the pendency of the case, DCS filed two amended petitions and then, on March 8, 2018, filed its third (and final) amended petition alleging the Children were CHINS, as defined in Indiana Code section 31-34-1-1, that read in relevant part as follows:

> Inability, Refusal or Neglect, I.C. 31-34-1-1: The child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and the child needs care, treatment, or rehabilitation that the child is not receiving; and is unlikely to be provided or accepted without the coercive intervention of the Court.

> For Educational neglect, See also, The Compulsory School Attendance law, I.C. 20-33-2-6: A child must attend school until one of the following occurs: (1) the child graduates from high school; (2) the child reaches eighteen years of age; or (3) the child is sixteen or seventeen years of age and is given written consent to withdraw by his parents and his principal at an exit interview. It is unlawful for a parent to fail, neglect or refuse to send their child to school for the "full term" of School Corporation where the child resides; and the child needs care, treatment, or rehabilitation that the child is not receiving; and is unlikely to be

---

[4] Expectations were modified due to the Children's learning disabilities.

provided or accepted without the coercive intervention of the Court.

[S.P.] Appellant's Appendix, Volume 2 at 75-76.[5] A fact-finding hearing was held on April 18, May 1, June 4, July 24, and September 4, 2018.

[10] On November 30, 2018, the juvenile court entered a written order containing the following findings regarding its CHINS determination:

12. [T]he home was deplorable and cluttered consisting of box[es] piled shoulder high, maggots crawling on old food, a foul odor about the residence, and the outside including the front porch was piled with items, trash and old food.

13. [DCS] attempted to allow the family to address the needs of the home and [C]hildren prior to initiating these current proceedings; however, even with the involvement of intensive home base[d] services through a community agency, namely SCAN, the home remained below standards.

14. [O]n the last day of these proceedings, it was evident that the conditions of the home had improved; however, it was also evident that whether the conditions remained improved was fluid from day to day. It was through the continued provision of services that the home remained in a minimally suitable condition for the [C]hildren to remain place[d] with the [Guardians].

15. [W]hen [DCS] began its investigation[, S.P.] could not produce a calendar to show when she conducted educational

_____

[5] Identical allegations were made as to both L.S. and M.S.

activities. . . . [W]hen SCAN intensive homebased services were implemented into the home in October of 2017, [S.P.] could not find the educational materials when asked by homebased case manager Nicoma Cook.

16. Throughout the course of these proceedings[,] . . . neither guardian has produced any information concerning the curriculum or materials being utilized in the home schooling. Although, [S.P.] claims that she has provided [DCS] with her materials, through nearly five (5) days of trial, neither guardian produced any tangible evidence of educational materials or even a curriculum.

17. [A]lthough the [G]uardians had an area of the house dedicated to education, there was old and new feces from the families [sic] over 13-18 cats in and out of the home. . . . [A]lthough [S.P.] identifies computer games, movies and other learning games as educational activities, . . . the cats have destroyed some educational material by defecat[ing] and urinating on the items.

* * *

21. [T]he [Children] have struggled with impulsivity and have engaged in risky behaviors including potential elopement with strangers. . . . [T]he level of the [Children's] behavioral needs is overwhelming and the [G]uardians are not able to provide appropriate education for the [C]hildren. . . . [The family therapist] does not recommend a public-school setting and [recommends] an in home specialized educational service through an outside source to provide and monitor[ ] the [C]hildren's education.

* * *

24.	[A]lthough the [C]hildren were making progress while working with Growing Minds, progress was slow due to the [C]hildren and the [G]uardians failing to ensure homework was done. . . .

25.	[W]henever the [C]hildren have come into contact with trained educators, they made progress; evidencing the fact that [they] benefit from formal educational instruction.

26.	[A]lthough [S.P.] contends a formal school setting is not equipped to handle the special needs of the [C]hildren, [S.P.] has not established what those accommodations should be and how she is addressing them in her home.

27.	[DCS] has provided multiple opportunities for [S.P.] to look into other educational opportunities for which [sic] [S.P.] resisted at all times relevant.

28.	[S.P.] has been opposed to the intervention of any services to assist in the education of the [C]hildren.  This is evident from her lack of follow through after the 2015 program of informal adjustment and the fact that [S.P.] was not happy with Growing Minds and enrolled the [C]hildren in another educational service.

29.	[B]y the time of the last day of trial, [S.P.] was only permitting the [C]hildren to attend educational services two days a week as she does not want to utilize the financial services available through [DCS]. . . . [A]t the time of trial the [C]hildren were not able to access more than 2 days of education per week[.]

30.	[I]t is harmful to the well-being and development of these [C]hildren to not receive a proper and adequate education.

Appealed Order at 3-4. Based on these findings, the juvenile court concluded the Children were CHINS:

> [The Children's] mental conditions are seriously impaired as a result of the inability, refusal, and neglect of the [C]hildren's parents and [G]uardians to provide them with suitable care, supervision, and education.
>
> The Court further concludes that the [C]hildren need care, treatment and rehabilitation that they are not receiving and are unlikely to be provided without the coercive intervention of the Court.
>
> . . . [Guardians] have not acted with malice. However, . . . they are overwhelmed and not situated and equipped to provide these [C]hildren with their educational needs. . . . [T]he condition of the home remains variable and without intervention of services, the home is likely to return to the previous deplorable state.
>
> The Court does not conclude or rule as to the manner in which the [Children] should be educated (i.e. in a tradition[al] setting vs. an untraditional setting). The Court concludes only that they are not being properly educated by their Guardians[.]

*Id*. at 5. Guardians now appeal.[6] Additional facts will be supplied as necessary.

# Discussion and Decision

---

[6] S.P. and P.P. initially appealed under separate cause numbers. However, per order of this court, the appeals were consolidated. The parties have filed individual briefs.

# I. Standard of Review

A CHINS proceeding is a civil action and thus, requires the State to prove by a preponderance of the evidence that a child is a CHINS as defined by statute. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012). "Preponderance of the evidence" "simply means the greater weight of the evidence." *Kishpaugh v. Odegard*, 17 N.E.3d 363, 373 (Ind. Ct. App. 2014) (quotation omitted). On appellate review of a juvenile court's determination that a child is in need of services, we do not reweigh the evidence or judge the credibility of the witnesses. *In re S.D.*, 2 N.E.3d 1283, 1286 (Ind. 2014). Rather, we consider only the evidence supporting the juvenile court's decision and any reasonable inferences arising therefrom. *Id.* at 1287. Where, as here, the juvenile court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review. *In re A.M.*, 121 N.E.3d 556, 561 (Ind. Ct. App. 2019), *trans. denied*. We first consider whether the evidence supports the findings and then whether the findings support the judgment. *Id.* We will set aside the juvenile court's findings and conclusions only if they are clearly erroneous and our review of the record leaves us firmly convinced a mistake has been made. *Id.*

# II. CHINS Determination

Guardians argue there is insufficient evidence supporting the Children's CHINS adjudication. Specifically, they challenge the juvenile court's conclusion that the Children are unlikely to be provided with safe and sanitary home conditions and proper education without coercive intervention of the court. We disagree.

[13] "[T]he purpose of a CHINS adjudication is to protect children, not punish parents." *In re N.E.*, 919 N.E.2d 102, 106 (Ind. 2010). Accordingly, a CHINS adjudication focuses on the child's condition and status and a separate analysis as to each parent (or guardian) is not required at the CHINS determination stage. *Id*. at 105-06. There are three basic elements DCS must prove for a juvenile court to adjudicate a child a CHINS: that the child is under eighteen years of age; one or more of the statutory circumstances outlined in Indiana Code sections 31-34-1-1 through -11 exists; and the care, treatment, or rehabilitation required to address those circumstances is unlikely to be provided or accepted without the coercive intervention of the court. *Id*. at 105.

[14] Here, DCS alleged that the Children were CHINS pursuant to Indiana Code section 31-34-1-1. To meet its burden, the State must prove that the child is under age eighteen,

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
> (A) the child is not receiving; and
>
> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

Ind. Code § 31-34-1-1 (2005). Following the hearing, the juvenile court concluded the Children's mental conditions are seriously impaired as a result of Guardians' inability, refusal, and neglect to provide them with appropriate care, supervision, and education, and that the Children need care they are not receiving and are unlikely to receive without the coercive intervention of the court. *See* Appealed Order at 5.[7]

[15] With respect to the home, the juvenile court concluded that its condition, although improved, remains variable and, without intervention, will likely return to its "previous deplorable state." *Id.* Guardians argue that the condition of the home has significantly improved since DCS' initial involvement and any safety concerns have been alleviated. Although the uncontroverted evidence demonstrates that the conditions of the home have, in fact, improved, additional evidence in the record also supports the juvenile court's finding that the conditions remain variable.

[16] FCM Vanstrom has been visiting the home weekly since October 2017 and her last visit occurred on June 1, 2018, several days before her testimony at the fact-finding hearing. Vanstrom testified that she had an ongoing concern about the condition of the home and agreed that Guardians "are overwhelmed with moving and meeting the needs of the kids at the same time and that's why some of the house conditions aren't always being addressed appropriately[.]" Tr.,

---

[7] There is no dispute that a lack of proper education and unsanitary home conditions seriously impair the Children's mental condition and is harmful.

Vol. 1 at 160. She indicated that the number of cats in the home is an issue. In fact, on several occasions she observed a "couple piles for [sic] feces in the room that was dedicated for the [Children's] school and education room." *Id.* at 138. She discussed the accidents with Guardians and S.P. told her that the cats have had accidents in other places in the home. Vanstrom also testified that she and Guardians had many discussions about the cats during which Guardians indicated their plan to find homes for the cats or take some to the shelter. To Vanstrom's knowledge, Guardians did not take any steps toward finding homes for the cats. At that time of the hearing, the family had about twenty-five cats.

[17] Furthermore, Vanstrom testified that the family still struggles with maintaining the cleanliness of the home, which causes her concern about the sanitation of the house. SCAN has helped and continues to help the family declutter the home and maintain a schedule to keep the house clean and sanitary. Another concern for Vanstrom was that she had to constantly remind the family to complete her requests and agreed they have "been hesitant at times to follow through with many of the things that are put in place to try to help" them. *Id.* at 155. In addition, the safety of the basement was of particular concern because it appeared that L.S. slept on a cot in an area of the basement surrounded by items that were stacked high and could easily fall on her. Based on the evidence in the record, there is sufficient evidence to support the juvenile court's conclusion that "the condition of the home remains variable and

without intervention of services, the home is likely to return to the previous deplorable state." Appealed Order at 5.[8]

[18] The juvenile court also concluded Guardians "are overwhelmed and not situated and equipped to provide these [C]hildren with their educational needs." *Id*. Jeremy Lewis, the Children's therapist, testified that the Children "[a]bsolutely" have special needs. Tr. Vol. 1 at 176. When he first began working with them, they were "some of the most impulsive children [he had] ever experienced . . . . Highly oppositional and defiant, reactive[.]" *Id.* at 175-76. He opined that this behavior "would overwhelm most caregivers." *Id*. at 176. Although Guardians are open to obtaining resources, Lewis explained "the difficulty has been obtaining the *right* resources for [the Children] given their very specific needs." *Id*. at 179 (emphasis added).

[19] When DCS investigator Murriel first visited the family, S.P. indicated she was homeschooling the Children but was unable to provide any documentation or information on the homeschooling. S.P. testified,

> I didn't have a per say [sic] curriculum. I just used where the [Children were] and where their learning disabilities were and where they would be able to understand what they needed. According to the books that I've read and also the teaching manuals that I have gotten from British Columbia, Florida and

---

[8] Although Guardians point to the testimony of home-based caseworker, Nicoma Cook, that the home was safe and appropriate and she did not have any concerns about its condition, we must view the evidence most favorably to the juvenile court's decision. *See In re S.D.*, 2 N.E.3d at 1287.

our own Health and Human Services, I also have a booklet from them.

*Id.* at 231. FCM Vanstrom requested proof that the Children were receiving education to find out whether there was any type of curriculum being followed, a daily planner, or a consistent schedule, but she never got it. Instead, the only documentation she received was from Growing Minds "of what the [Children] were currently working [on] and initial assessments[.]" *Id.* at 146.

[20] We acknowledge that Guardians have spent a lot of time researching the Children's conditions and ways to address their special needs, and have sought out numerous educational, medical, and behavioral services. Nonetheless, there is ample evidence in the record to support the juvenile court's conclusion that Guardians are unable to meet the Children's educational needs without the coercive intervention of the court. As our supreme court has explained,

> [w]hile we acknowledge a certain implication of parental fault in many CHINS adjudications, the truth of the matter is that a CHINS adjudication is simply that – a determination that a child is in need of services. Standing alone, a CHINS adjudication does not establish culpability on the part of a particular parent. . . . In fact, a CHINS intervention in no way challenges the general competency of a parent to continue a relationship with the child.

*In re N.E.*, 919 N.E.2d at 105.

[21] In sum, we conclude there is sufficient evidence in the record to support the juvenile court's conclusion that the Children are CHINS.

# Conclusion

For the reasons set forth above, we conclude the juvenile court's determination that the Children were CHINS was not clearly erroneous. Accordingly, the judgment of the juvenile court is affirmed.

Affirmed.

Mathias, J., and Pyle, J., concur.