## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 30 2020, 10:39 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Michael D. Gross
Lebanon, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of M.T.,
*(Minor Child)*
*Child in need of Services*


K.B. *(Mother)*,

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner,*

March 30, 2020

Court of Appeals Case No.
19A-JC-2402

Appeal from the Boone Circuit Court

The Honorable Lori N. Schein, Judge

The Honorable Sally E. Berish, Magistrate

Trial Court Cause No.
06C01-1904-JC-132

**Robb, Judge.**

# Case Summary and Issue

[1] K.B. ("Mother") appeals the juvenile court's determination that her child is a child in need of services ("CHINS") and raises the sole issue of whether there was sufficient evidence to support the juvenile court's determination. Concluding there was sufficient evidence to support the juvenile court's judgment, we affirm.

# Facts and Procedural History

[2] Mother is the biological mother of M.T. ("Child"), born December 24, 2007. In 2015, Mother married D.B., Child's stepfather ("Stepfather").[1] Child had resided with her maternal grandmother for most of her life. After maternal grandmother died in 2017, Child began living with Mother and Stepfather (collectively, "Parents").

[3] On April 18, 2019, the Indiana Department of Child Services ("DCS") received a report from school administrators that Child was suicidal and upset. Child attended Granville Wells Elementary School and, at lunch that day, Child's friend noticed red marks on Child's wrists and Child told her friend that she wanted to kill herself. The friend then reported the conversation to a staff member. Around 1:00 p.m., John Reynolds, the school's assistant principal, called Child into his office to discuss the conversation she had with her friend

---

[1] Child's biological father is deceased; Stepfather is not the legal father of Child.

and why she had the marks on her wrists. After speaking with Child, Reynolds informed Principal Tricia Stanley that he was "seriously concerned" for Child. Transcript, Volume 2 at 104. Reynolds then completed a formal Suicide Intake "to determine if [Child] had a plan and a way of going about a suicide." *Id.* at 104-05. Following the intake, Reynolds became even more concerned for Child's mental health and called Mother, but she did not answer so he left a voicemail. Reynolds and Stanley were reluctant to send Child home "simply because [they] didn't know where [Mother] was and [they] wanted to make sure [Child] was in . . . the hands of an adult who understood what was going on with [Child]." *Id.* at 105.

[4]     During the intake conversation, Child indicated her home life was the source of her distress. Stanley testified, "It turned more from talk of suicide to the reason behind why she felt the way she did which was her home life." *Id.* at 106. Stanley contacted the Superintendent and informed him of their concerns about sending Child home and he agreed Child should not go home. Stanley subsequently contacted Officer Jeremy McClaine of the Boone County Sheriff's Office, who served as the school's resource officer, and requested that he visit Child's home to locate her parents. Stanley also contacted the Integrated Wellness ("InWell") therapist assigned to their school for a professional opinion, as well as DCS for immediate assistance.

[5]     Around 4:30 to 5:00 p.m., Officer McClaine went to Child's home to make contact with Parents. He knocked on the front door of the home and no one answered; he then walked around the gate to the back door, knocked again, and

no one answered. Officer McClaine observed a truck in the driveway but after six to seven minutes, he left.

[6] In the meantime, school administrators asked Christine Kobiela, a licensed clinical social worker at InWell, to assess Child "[d]ue to some potential Suicidal Ideation and also concerns about whether or not [Child] was at home alone or not." *Id.* at 140. Kobiela completed a formal Suicide Risk Assessment during which Child indicated several ways she could potentially kill herself, such as hanging, shooting, or stabbing herself. Kobiela stated, "there was a little bit of a follow through[;] [Child had] said she was out in the yard . . . and that she had thought of . . . taking [a dog] chain around her neck to choke herself." *Id.* at 145. Child also stated that the night before she made superficial marks on her wrists. Kobiela observed the marks on Child's wrists and described them as "very superficial[.]" *Id.*

[7] Following the assessment, Kobiela rated Child a "three" on the Columbia Suicide Rating Scale – "meaning that happens a lot of times and [the child] ha[s] plans and [the child] thought about it." *Id.* at 146. Child also indicated that she was scared to go home and was worried that her Stepfather would be angry that she shared information; Kobiela opined that there was a link between Child's behavior and her interactions at home and treatment by Stepfather. Kobiela agreed with the school administrations that the situation was very serious.

[8] When DCS family case manager ("FCM") Lisa Lee arrived, Kobiela had already completed the risk assessment. In her interview with Lee, Child revealed some physical abuse and fear about going home. Lee testified as to why Child was afraid to go home: "[S]he stated some things that happened with a belt to her[,] . . . she had been home alone a lot because her parents . . . were working overnight[, and] she had been responsible for finding her own food." *Id.* at 8. With respect to Child's suicidal ideation, Child revealed that she had been told to "go ahead and kill herself it would make the parent's job easier" and stated that she had a clear plan to kill herself with a chain in her backyard. *Id.* Although Child had a concrete plan to kill herself, she did not have a time frame. At that time, DCS did not want Child to go home and therefore, Child was detained and sent to an emergency foster home placement. Throughout the afternoon and evening, Lee had called Parents and Stanley sent an e-mail; however, neither received a response.

[9] Around 6:00 or 7:00 p.m., Parents contacted DCS via e-mail, stating they had received the notification. Later that evening, Parents met with Lee to discuss the situation. Lee informed Parents of the allegations, explained that detention was necessary because Child was at risk for suicide, and stated that Child had been taken to foster care. Parents responded that Child's allegations were untrue. Parents' explanation for not responding was that they were sleeping and then looking for their dog. Parents agreed to submit to a drug screen; Lee scheduled a home visit for April 20.

[10] On the date of Child's removal, Mother had recently started a new job at McDonald's and worked the 10:00 p.m. to 6:00 a.m. shift, Sunday through Thursday. Stepfather also worked the night shift – 10:30 p.m. to 6:30 a.m., Sunday through Thursday – at Hendricks Trailer. Due to Parents' schedules, Child had been left alone overnight and had been getting herself up and ready for school. However, while Mother and Stepfather were working, a family friend would check on Child around midnight and Child was able to use her cell phone and tablet at home on Wifi.[2]

[11] Prior to the incident, Child's academic performance had been declining over the academic year as she failed to turn in multiple assignments; Child's demeanor changed; and she also had numerous absences and several disciplinary incidents at school. Specifically, Child had twenty-one full day absences and ten partial day absences – eight of which were unexcused – and had been suspended from school and the bus for making threats.

[12] On April 20, Lee visited the family's home and observed Child's room, which did not have a bed or any furniture. Mother stated that they were redoing Child's room and, in the meantime, Child slept on the couch in another room. Lee observed the bathroom Child used, which appeared unsanitary and was not in working condition. Mother stated that they were doing work on the bathroom as well but there was a second bathroom available and in working

---

[2] Child's cell phone, referred to as an "internet phone," could only be used when connected to Wifi. Tr., Vol. 2 at 30.

condition. In addition, Mother told Lee they used the oven for heat because they were unable to afford propane. Due to the condition of the home, Lee recommended that visits with Child not take place at the home. Lee also put in referrals for Parents for mental health care and substance abuse treatment.

[13] DCS filed a petition alleging that Child was a CHINS on April 22 due to Parents' inability, refusal, or neglect to supply Child's needs, educational neglect, and acts or omissions seriously endangering Child's physical or mental health. *See* Appellant's Appendix, Volume 2 at 16-17. An initial/detention hearing was held the next day during which Parents denied the allegations set forth in the petition. The juvenile court subsequently ordered Child to remain in her current foster home. At some point, a visitation schedule was put in place – a two hour visit once each week.

[14] Following an intake assessment on June 5, Kobiela diagnosed Child with Adjustment Disorder with depressed mood, Attention-Deficit/Hyperactivity Disorder, Parent-Child Relational Problem, Uncomplicated Bereavement, and Encounters for Victims of Child Abuse by Parent and Victim of Child Abuse by Parent. *See* Index of Exhibits, Volume 4 at 51-54; *see also* Tr., Vol. 2 at 152. Kobiela recommended that Child participate in individual therapy, skills coaching, and family therapy.

[15] A fact-finding hearing was held on June 4, July 11, and July 30, 2019. On August 16, 2019, the juvenile court issued an order adjudicating Child a CHINS and found, in pertinent part:

32) Child's last physical examination was in 2017. Child's last dental examination was over two years ago when she complained of a toothache. Child had no eye exams prior to removal.

33) Child received minimal counseling at the time of her Father's death.

34) Prior to removal Child had thirty-one (31) absences or tardies from school during the 2018-2019 school year. School officials contacted . . . Parents regarding these absences/tardies, with few responses and no positive results.

35) Child had multiple missing or incomplete assignments during the same period. School officials contacted Parents regarding the same with varying degrees of success in receiving completed work. . . .

36) Child began having behavioral issues, reported by the school, in 2nd grade. Mother discussed the same with Child's pediatrician, who recommended medication. The medication upset Child's stomach so Mother discontinued use and took no follow up steps on the matter.

37) Fall semester 2018 Child's behavioral issues escalated, resulting in a suspension from riding the school bus and ultimately an out of school suspension in December 2018.

38) During the same time period Mother noticed Child's demeanor substantially change, becoming very negative and out of character.

39) Parents met with school officials on the matter and the school provided a counseling referral and recommended Child

undergo a mental health assessment and follow recommendations. School officials explained to Mother the availability of no cost therapy for Child through the school if there was any concern regarding cost of services.

40) Although Mother agreed with school officials that Child needed therapy and indicated she would set up an appointment for the same, Parent's [sic] did not follow through on the recommendation.

41) Mother believed Child's behavior was due to "girl drama" and did not follow up on recommendations for further evaluation/services.

42) [On] April 18, 2019 school officials intervened when Child presented with serious and credible suicidal ideation and created superficial cuts on her arm during lunch with a plastic fork after telling a friend she wanted to kill herself.

43) Following a therapeutic interview with Child during which she reiterated her suicidal intent and a fear of going home, school officials kept Child in their custody instead of releasing her to the bus. School began attempting to contact Parents to come pick Child up prior to dismissal . . . with no success.

* * *

46) DCS was contacted for an immediate response as Parents could not be located.

47) DCS interviewed Child and school officials regarding the day's incident and attempted to contact Parents with no success.

48) Child was detained by DCS at 7:00 p.m.

49) Parents responded to DCS and met with FCM Lee at the DCS office around 8:00 p.m. Parents denied all allegations or knowledge of Child's suicidal ideation. Parents had no explanation of the delay in responding to attempts at locating them.

* * *

51) Parents believe Child's state of mind and actions on April 18, 2019 are a result of her being grounded on April 17, 2019 and having her electronics taken away.

* * *

55) Child's academic performance and overall demeanor have substantially improved since detention and DCS referred therapy and services.

* * *

60) Except for attending supervised visitation, Parents have failed to cooperate with DCS or voluntary [sic] begin any family services during the pendency of the case.

Appellant's App., Vol. 2 at 113-16 (record citations omitted). Based on these findings, the juvenile court concluded:

4. DCS has proven by a preponderance of the evidence that [Child] is a [CHINS] as defined by [the CHINS statute] and incorporating IC 20-33-2-6 [the compulsory attendance statute] in that her physical and mental condition is seriously endangered as a result of the inability, refusal or neglect of Parents to provide her with necessary food, shelter, education, medical care and

supervision. Child needs care[,] treatment, or rehabilitation that was not and is unlikely to be provided or accepted without the coercive intervention of the court.

5.     Child is [a CHINS] in that [Parents] have failed to [e]nsure her attendance at school on a regular basis and completion of homework to assure her academic success. [Parents] have failed to supply Child with safe and stable housing, food and medical care. [Parents] have failed to provide Child with appropriate supervision [and] have wholy [sic] failed to appreciate Child's mental health needs and provide her with the mental health care and treatment she needs. Child is successfully receiving counseling following DCS intervention through referrals by DCS. [Parents] are employed and may have the financial ability to continue therapeutic services for Child were the case closed, however they have shown a pattern of behavior that evidences they will not do so outside of Court intervention. [Parents] have entered into no homebased or family therapeutic services during the pendency of the case; or indicated any agreement to do so. There is a clear need for continued Court intervention to [e]nsure the continuation of services for Child, and [Parents'] participation in services.

*Id.* at 117-18. Following a dispositional hearing, the juvenile court ordered that Child remain in her current placement and also ordered Mother to (among other things) maintain weekly contact with the FCM; maintain suitable housing and a stable income; submit to random drug screens; participate and complete an Intensive Family Preservation program; timely meet all medical and mental health needs of Child; and attend visitation with Child. *See* Appealed Order at 3-4. Mother now appeals.

# Discussion and Decision

## I. Standard of Review

A CHINS proceeding is a civil action and thus, requires the State to prove by a preponderance of the evidence that a child is a CHINS as defined by statute. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012).[3] On appellate review of a juvenile court's determination that a child is in need of services, we do not reweigh the evidence or judge the credibility of the witnesses. *In re S.D.*, 2 N.E.3d 1283, 1286 (Ind. 2014). Rather, we consider only the evidence supporting the juvenile court's decision and any reasonable inferences arising therefrom. *Id*. at 1287. Where, as here, the juvenile court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review. *In re A.M.*, 121 N.E.3d 556, 561 (Ind. Ct. App. 2019), *trans. denied*. We first consider whether the evidence supports the findings and then whether the findings support the judgment. *Id*. We will set aside the juvenile court's findings and conclusions only if they are clearly erroneous and our review of the record leaves us firmly convinced a mistake has been made. *Id*.

## II. Adjudication as CHINS

First, we note that Mother does not challenge any of the juvenile court's findings as clearly erroneous; instead, she offers explanations and justifications

---

[3] "Preponderance of the evidence" "simply means the greater weight of the evidence." *Kishpaugh v. Odegard*, 17 N.E.3d 363, 373 (Ind. Ct. App. 2014) (quotation omitted).

for her actions related to those findings – primarily the family's economic circumstances. *See* Brief of Appellant at 16 ("The [juvenile] court's findings focus extensively on matters that are a result of the economic circumstances of the family."). Therefore, we accept the juvenile court's findings as true. *In re S.S.*, 120 N.E.3d 605, 610 (Ind. Ct. App. 2019).

[18] "[T]he purpose of a CHINS adjudication is to protect children, not punish parents." *In re N.E.*, 919 N.E.2d 102, 106 (Ind. 2010). Accordingly, a CHINS adjudication focuses on the child's condition and status, and a separate analysis as to each parent (or guardian) is not required in the CHINS determination stage. *Id*. at 105-06. There are three basic elements DCS must prove for a juvenile court to adjudicate a child a CHINS: that the child is under eighteen years of age; one or more of the statutory circumstances outlined in Indiana Code sections 31-34-1-1 through 11 exists; and the care, treatment, or rehabilitation required to address those circumstances is unlikely to be provided or accepted without the coercive intervention of the court. *Id*. at 105.

[19] In this case, DCS alleged that Child was a CHINS pursuant to Indiana Code section 31-34-1-1. To meet its burden under this section, the State must prove that the child is under age eighteen,

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

(2) the child needs care, treatment, or rehabilitation that:

    (A) the child is not receiving; and

    (B) is unlikely to be provided or accepted without coercive intervention of the court.

Ind. Code § 31-34-1-1 (2005).[4] DCS also alleged Child was a CHINS pursuant to Indiana Code section 31-34-1-2, which requires the State prove a child is under eighteen and:

    (1) the child's physical or mental health is seriously endangered due to injury by the act or omission of the child's parent, guardian, or custodian; and

    (2) the child needs care, treatment, or rehabilitation that:

        (A) the child is not receiving; and

        (B) is unlikely to be provided or accepted without the coercive intervention of the court.

---

[4] Effective July 1, 2019, the CHINS statute was amended to include the following under subsection (1): "(A) when the parent, guardian, or custodian is financially able to do so; or (B) due to the failure, refusal, or inability of the parent, guardian, or custodian to seek financial or other reasonable means to do so[.]" Because DCS filed its CHINS petition prior to this amendment, the previous version quoted above applies here; however, even under the amended statute, as discussed below, the CHINS adjudication would still stand.

Lastly, DCS alleged Child was a CHINS under Indiana Code section 20-33-2-6, which mandates school attendance until the student meets the statutory criteria.

[20] Here, the juvenile court adjudicated Child a CHINS due to Parents' failure to ensure Child's regular attendance at school and completion of homework; failure to provide safe and stable housing, food, and medical care; failure to provide appropriate supervision; and failure to "appreciate Child's mental health needs and provide her with the mental health care and treatment she needs." Appellant's App., Vol. 2 at 118.

[21] Mother challenges the juvenile court's conclusion adjudicating Child a CHINS, arguing there is insufficient evidence to support the determination and that her inability to provide Child with what she needed "was a result of economic circumstances, not her refusal to provide the needed services to the Child." Br. of Appellant at 12. We conclude there is ample evidence in the record to support the juvenile court's conclusion.

[22] DCS initially became involved in this case in response to Child's mental health issues – depression, suicidal thoughts and plans, and self-harm behaviors– and concerns that Child lacked supervision. Prior to the April incident, Child's academic performance had been declining as she failed to turn in multiple assignments; Child's demeanor had changed; and she also had numerous absences and several disciplinary incidents at school.

[23] Kendra Marshall was Child's teacher for the 2018-2019 school year. Marshall testified that Child's academic performance "started out okay, [but] she

definitely got worse as the year progressed. She struggled to turn in assignments[.]" Tr., Vol. 2 at 162. Marshall recalled that Child began to seriously decline around December 2018 – Child had been getting B's and C's, but then her grades began to fall. "[S]he wasn't turning in her assignments, her level of care about getting things done in class and at home kind of disappeared and she really didn't care for those things and her grades were starting to fall." *Id.* at 162-63. Marshall reached out to Parents several times in December: she called a few times and e-mailed them as well but did not receive a response. On December 18, Marshall sent a handwritten note to Mother, which addressed Child's declining performance and missing work and proposed a plan to help Child succeed. *See* Index of Ex., Vol. 4 at 56.[5] Several days later, Mother sent Marshall an e-mail response regarding the missing assignments. However, Marshall stated that not much changed after the exchange with Mother, although Child did turn in some work.

[24]    In February 2019, Marshall reached out to Mother again regarding a large social studies paper Child did not turn in. Mother responded that Child would make up her work and stated she spoke with Mr. Reynolds about counseling. However, Marshall testified that "ended up not happening. That was supposed to be at the school and that meeting was missed." Tr., Vol. 2 at 169.

---

[5] A typed copy of the handwritten note was admitted into evidence. *See* Tr., Vol. 2 at 163. Marshall testified that she put the handwritten note "in an envelope and [gave] it to [Child] and told her, [she] needed . . . to hand it to her mom and her step-dad." *Id.* at 165.

[25]     Prior to DCS involvement in April, school administrators asked Kobiela to meet with Child to complete a crisis assessment. Kobiela met Child in February 2019 and learned from Child that "the family had moved there recently[,] her grandmother had passed about a year before that[.] [S]he indicated that the house itself, that she was sleeping on the couch it had a space heater, running water, but that she was there by herself sometimes." *Id.* at 137. After the assessment, Kobiela sent letters home, but was unable to reach Mother. Another InWell therapist at the school also reached out to Mother and received a response from Mother that she planned to obtain services through another agency; however, Mother never provided any information or confirmation that services were started through another agency.

[26]     On April 15, 2019, Marshall sent Mother another e-mail regarding Child's grades, missing work, and overall attitude. Mother responded that she would speak with Child and that Child was starting therapy and medication that week. There is no evidence that Child began therapy or took medication at this time. Days later, Child revealed to her friend that she wanted to kill herself and had marks on her wrists. She was interviewed by the school administrators, the school therapist, and DCS – all of whom were extremely concerned for Child's mental health, home life, and lack of supervision. Child was subsequently detained by DCS and placed in foster care.

[27]     In addition to Child's declining academic performance, Child had twenty-one full day absences and ten partial day absences – eight of which were unexcused – and had been suspended from school and the bus for making threats.

Specifically, Child had two discipline incidents before Christmas 2018. Administrators called Parents and they came to the school for a meeting at which time administrators reiterated their concern for Child and recommended therapy. Parents agreed but indicated they were waiting for insurance to go through to be able to pay for therapy. Stanley explained that the school had an InWell therapist in the building that could help with part of that, although there could be a cost, and provided the therapist's business card. Stanley had previously discussed Child's situation with Kobiela and told Mother that Kobiela, the school's InWell therapist, might contact her.

[28] At the fact-finding hearing, Mother stated she reached out to Hendricks Therapy and made an appointment "because we had been noticing some behavior changes, some issues, . . . a lot of signs of [A]DD[.] And then once the school started having issues, it was time to because [Child] has never had any disciplinary action in any grade[.]" *Id.* at 216. However, documentation of Child's appointment history at Hendricks Therapy that was admitted into evidence at the hearing was blank, indicating no appointments had been made; Child's patient history information also indicated only that Hendricks Therapy reached out to Mother and left a message to schedule a new patient appointment. *See* Index of Ex., Vol. 4 at 82-83.

[29] The evidence also demonstrates that Child constantly lacked appropriate supervision, food, and adequate shelter. At the fact-finding hearing, Bradley Thomas, the town marshal, testified that over the winter months, Mother approached him "about how they just moved to town and she had miss-

budgeted [sic] and . . . didn't have any money for food." Tr., Vol. 2 at 128. Thomas provided the family with food approximately three times and later stopped to check in on the family after having been informed that they were out of gas and did not have heat over the winter. Thomas further explained that Child "was around town most of the time . . . after school . . . until dark she usually was running around town" meaning she was "[j]ust hanging out around the town building around the downtown. . . . [g]oing from friend's houses to the next friend and just walking back and forth." *Id.* at 130. Thomas recalled one instance in which Child was locked out of her house, unable to get in, so she went to the town building. Thomas' deputy tried to help her, but it took several hours before he was finally able reach Child's Parents. Thomas testified that he contacted DCS twice in the past with concerns regarding Child. *See id.* at 132. And he had recently been involved in an eviction regarding the family.

[30] In addition to the evidence revealing that Child was often running around town unsupervised, she was left alone overnight excluding a brief period of time when a family friend would check in. At the fact-finding hearing, Mother admitted that Child was alone from approximately 9:45 p.m. to midnight (when a friend would check on her) and then again until 6:45 a.m.; however, she stated that Child had a phone in case she needed to contact her. Amanda Wethington, a former neighbor of Parents', testified that she began to check on Child when Mother started to work at McDonald's; she would check on her once, after 11:00 p.m., for roughly five to ten minutes. Child could contact her via Facebook.

[31] With respect to the condition of the home, Thomas visited the home after learning the family was out of gas and stated there was no furniture inside the house but observed sleeping bags and blankets on the floor of the front room. FCM Lee visited the home in April and described the unsanitary conditions and lack of furniture.

[32] Lastly, Lee also testified that Parents are currently involved in visitation with Child; however roughly every third visit is not happening "for various reasons." *Id.* at 43. Amy Knoll, home based case manager and visitation manager at Rose Project, testified that Parents' first supervised visit with Child was May 17. Parents failed to show for the second visit on May 22 and failed to notify Knoll they were not coming. Knoll stated, "Originally [visits] were to be two times a week in the community for two hours but after the second week there was a no show and the [FCM] changed that to once a week for two hours in the community." *Id.* at 198. Of nine scheduled visits, three had been cancelled – one cancelled by Knoll because Parents failed to confirm the time and location of the visit; one because Parents failed to show; and the other cancelled by Mother due to illness.

[33] In her brief, Mother focuses on her economic circumstances and the effect thereof. She concedes that due to the family's financial situation, she is "*unable, not unwilling*, to provide the services needed by her child." Br. of Appellant at 18 (emphasis added). Although in the context of termination of parental rights, our courts have held that "the fact that [a parent] is of low or inconsistent income of itself does not show unfitness, if the poverty causes [the parent] to

neglect the needs of [his or her] child[] or expose [his or her] child[] to danger, then the child[]'s removal is warranted." *In re B.D.J.*, 728 N.E.2d 195, 202 (Ind. Ct. App. 2000). And the court acknowledged the accuracy of the trial court's statement in that case regarding poverty: "'Poverty can be a crushing burden . . . However, poverty cannot excuse child neglect or abuse.'" *Id.* at 203. We agree with this principle and acknowledge Mother's economic circumstances in this case. Nonetheless, there is ample evidence in the record to support the juvenile court's conclusion that Mother is unable to meet the Child's mental health, educational, and basic needs without coercive intervention of the court. As our supreme court has explained,

> [w]hile we acknowledge a certain implication of parental fault in many CHINS adjudications, the truth of the matter is that a CHINS adjudication is simply that – a determination that a child is in need of services. Standing alone, a CHINS adjudication does not establish culpability on the part of a particular parent. . . . In fact, a CHINS intervention in no way challenges the general competency of a parent to continue a relationship with the child.

*In re N.E.*, 919 N.E.2d at 105.

In sum, we conclude there was sufficient evidence to support the juvenile court's conclusion that the care needed by Child was unlikely to be provided by Parents without the coercive intervention of the court.

# Conclusion

[35] We conclude there is sufficient evidence in the record to support the juvenile court's determination that Child is a CHINS. Accordingly, the judgment of the juvenile court is affirmed.

[36] Affirmed.

Bradford, C.J., and Altice, J., concur.