# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 07 2020, 8:51 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cara Schaefer Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Frances Barrow
Robert J. Henke
Deputy Attorneys General

Anthony J. Smith
Certified Legal Intern
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re the Termination of the Parent-Child Relationship of B.B.K, J-E.K., J-M.K., and A-M.K. (Minor Children) and<br><br>M.K. (Mother)[1],<br><br>*Appellant-Respondent,* | August 7, 2020<br><br>Court of Appeals Case No. 20A-JT-443<br><br>Appeal from the Vigo Circuit Court<br><br>The Honorable Sarah K. Mullican, Judge |

---

[1] The father of B.B.K. did not appear for the termination hearing, and his parental rights were terminated by default. The father of J-E.K., J-M.K., and A-M.K. offered in open court to voluntarily relinquish his parental rights to all three children, which the court took under advisement. Neither father participates on appeal.

|                                  | v.                    | The Honorable Daniel Kelly, Magistrate |
| Indiana Department of Child Services, | | Trial Court Cause Nos. 84C01-1909-JT-1109 84C01-1909-JT-1135 84C01-1909-JT-1136 84C01-1909-JT-1138 |
| *Appellee-Petitioner.* | | |

**Mathias, Judge.**

M.K. ("Mother") appeals the Vigo Circuit Court's order terminating her parental rights to her four children. Mother challenges four of the trial court's factual findings and argues that the trial court's termination of her parental rights is not supported by clear and convincing evidence.

We affirm.

## Facts and Procedural History

M.K. has four children: B.B.K. born in 2016, A.M.K. born in 2014, J.M.K. born in 2012, and J.E.K. born in 2011. Mother and the children were living in a homeless shelter in Terre Haute in January 2018. Mother had no income. The Department of Child Services ("DCS") filed a petition alleging that the children were in need of services ("CHINS"), but the children initially remained in Mother's care. However, Mother was "continually [] asked to leave homeless shelters and other residences due to lack of supervision of the children and aggressive behaviors towards the staff." Ex. Vol. 1, p. 88.

[4]     After the family was evicted from a homeless shelter at the end of January 2018, DCS removed the children from Mother's care because they had no other place to live. *Id*. at 75, 121. Mother moved to Indianapolis in February 2018 after the children were placed in foster care.

[5]     The children were adjudicated CHINS on June 25, 2018. While Mother was living in Indianapolis, she was unable to participate in visitation with the children because she lacked transportation to Terre Haute. Mother refused to participate in parenting counseling or work with home-based counselors. Mother believed the offered services were useless. She also failed to maintain consistent communication with DCS and her service providers. Mother missed appointments with service providers and was hostile toward her family case manager.

[6]     In February 2019, Mother moved back to Terre Haute. She began participating in supervised visitation with the children. Mother participated in four of six scheduled supervised visitations while she was living in Terre Haute. Visitation supervisors observed that Mother lacked the skills needed to effectively parent her children, who exhibited negative behaviors during the visitations. The children acted out physically and refused to listen to Mother. Mother was on telephone calls or social media during most of the visitation time. The visitation supervisor confiscated Mother's phone during one visit. Mother refused to listen to or follow suggestions from the supervising therapists. She also "rough-housed" with one child, causing the child to cry. Tr. p. 81. The supervising therapist had to intervene to get Mother to stop "rough-housing." *Id*.  Mother

was eventually escorted from the visit by security. Mother told the supervisor that she could do whatever she wanted to do with the children. Tr. p. 84.

[7] Mother was unable to secure stable housing in Terre Haute. She decided to move to Michigan where she believed she would be eligible for Section 8 housing. Mother lacked transportation to return to Terre Haute and has not had any visitation with the children since April 2019.

[8] DCS filed petitions to terminate Mother's parental rights to her four children in September 2019. Mother participated telephonically in the fact-finding hearings held on October 2 and December 30, 2019. Mother has not been able to obtain stable housing or a source of income since January 2018, when the children were removed from her care. Mother moved to Michigan despite advice from DCS that leaving Indiana would make it difficult to reunify with her children. And Mother informed the court during the fact-finding hearing that she had no intention of returning to Indiana. Tr. p. 131.

[9] On January 10, 2020, the trial court issued orders terminating Mother's parental rights to her four children. In pertinent part, the trial court found:

> f. There is a reasonable probability that the conditions which resulted in the removal of the child from his parents will not be remedied or the reasons for placement outside of the home of the parents will not be remedied or the reasons for placement outside of the home of the parents will not be remedied or that continuation of the parent-child relationship poses a threat to the well-being of the child as follows:
>
> * * *

5. Mother was given a referral for home-based case management with Ireland Home-Based Services, which was to assist her with coping skills, employment and housing. At the sole conference with [Mother], Mother was focused on getting to North Carolina or Michigan, where she had family residing. The service provider tried to get Mother to understand that her efforts should be concentrated on getting situated here, since all of her children were in the care of Indiana and were wards of the state.

6. The visitation supervisor who supervised Mother's visits in the spring of 2018 testified, and the court finds, that Mother attended four visits in the month of March 2018. She was late to all of her visits and no-showed two of the visits that were scheduled that month. During those supervised visits, the children were unruly and Mother did almost nothing to attempt to gain control over them. In addition, [Mother] refused to listen to suggestions on dealing with the children and was largely distracted. The kids would climb on tables and hit and bite one another, while Mother did nothing but ineffectually yell at them. When it was suggested that she put the children in time out, she would threaten to do so but failed to follow through.

7. When Robyn Morton became the DCS Family Case Manager for the family in September of 2018, [Mother] had been living in various places in Indianapolis and reported that she could not come to Terre Haute. She had been noncompliant with all court-ordered services, including submitting to a psychological evaluation, home-based casework, parenting counseling, random drug screens and visitation with her children. DCS tried to engage Mother in services while she was living in Indianapolis, but before any progress was made, she moved away from there. She was living in Jackson, MI, at the time of the termination fact-finding hearing and participated in the hearing by telephone.

8. In February 2019, Mother came back to Terre Haute for a short time and had some visits with the children. These visits went no better than the earlier ones. One of the children appeared to be ignored during the visits and then engaged in self-harming behaviors. She engaged in rough-housing with one of the children who began to cry. [Mother] continued the rough play while the child cried and the supervisors tried to get her to stop. Eventually they had to have a security guard come and remove [Mother] from the building.

9. Mother engaged in two sessions with the home-based case worker, after initially refusing to engage with her. But after those two sessions, Mother moved away again and has not seen any of the children since then. The [family case manager ("FCM")] is usually unable to reach [Mother] for telephone calls, but can often receive a reply to text messages. [Mother] calls the FCM approximately once a month. She is consistently hostile and belligerent in her interactions with DCS. She has refused to work reunification services with the FCM or anyone she has put in place to help her. To date, Mother has not secured safe and appropriate housing, gainful employment or transportation and has largely abandoned the children to their foster parents for the past two years. No one has been able to persuade Mother to return to Indiana where the children live.

Appellant's App. pp. 187–88.[2] The court concluded that termination of Mother's parental rights was in the children's best interests and found that the

---

[2] The trial court's findings numbers 6 and 8 discuss Mother's visitation with the children. Finding number 6 accurately describes the testimony of the visitation supervisors concerning Mother's behavior and lack of parenting skills during the visitations. But our review of the records does not support the trial court's finding that Mother had visitation with the children in 2018 and 2019. During these proceedings, Mother participated in only four visits with the children in the early months of 2019, with the last visit occurring in April 2019. In her brief, Mother agrees that she did not have any visitation with the children in 2018 when she lived in Indianapolis. *See* Appellant's Br. at 6.

children are thriving in their pre-adoptive placements. *Id.* at 188. Mother appeals the termination of her parental rights.

## Standard of Review

[10] Indiana appellate courts have long had a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). We neither reweigh the evidence nor assess witness credibility. *Id.* We consider only the evidence and reasonable inferences favorable to the trial court's judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* Clear error is that which leaves us with a definite and firm conviction that a mistake has been made. *J.M. v. Marion Cty. Off. of Family & Children*, 802 N.E.2d 40, 44 (Ind. Ct. App. 2004), *trans. denied*.

### I. Factual Findings

[11] Mother challenges four factual findings in the trial court's termination order. When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cty. Off. of Fam. & Child.*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial

court's decision, we must affirm. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[12] DCS agrees that the following challenged findings are not supported by clear and convincing evidence.

> 1. DCS initially received a report on October 31, 2017, alleging that Mother's oldest child, who is not a subject of these proceedings, was not attending school and by November 8, 2017, had 35 unexcused absences which were significantly impacting his performance in school. A 2nd report was received in December 2017, alleging that Mother and her four youngest children had been evicted from a homeless shelter while the oldest boy was living in Indianapolis with his father.
>
> 2. When DCS investigated the second report, Mother was located in Vermillion County, Indiana, living with a friend. She had no permanent residence and no transportation. The two youngest school-aged children were not going to school. The oldest boy was living with his father in Indianapolis but was not enrolled in school there because Mother was still planning to pick him up and enroll him in school.
>
> 3. Mother was evicted from the Conner Center homeless shelter and had to be out by December 15, 2017, due to her failure to supervise her children and her failure to follow the house rules. DCS persuaded the Conner Center to allow Mother to stay awhile longer while alternative housing was explored, but due to subsequent failures to supervise the children and Mother's rudeness to staff, she was not allowed to stay longer.
>
> 4. A friend of Mother's put her up in a hotel for one week. She was initially staying in Red Carpet Inn, but was told she had too many people in one room. She then moved to Motel 6.

Appellant's App. pp. 186–87.

Because DCS concedes that these findings are not supported by sufficient evidence, we will not consider these findings in our consideration of the remaining issue presented in this appeal. We accept the remaining unchallenged findings as true and determine only whether these unchallenged findings are sufficient to support the judgment. *In re A.M.*, 121 N.E.3d 556, 562 (Ind. Ct. App. 2019), *trans. denied*; *see also T.B. v. Ind. Dep't of Child Servs.*, 971 N.E.2d 104, 110 (Ind. Ct. App. 2012) (holding that when the trial court's unchallenged findings support termination, there is no error), *trans. denied*.

## II. Clear and Convincing Evidence

Mother claims that the trial court's order involuntarily terminating her parental rights is not supported by clear and convincing evidence. Indiana Code section 31-35-2-4(b)(2) provides that a petition to terminate parental rights must allege:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

[15]     DCS must prove each element by clear and convincing evidence. Ind. Code §
31-37-14-2; *In re G.Y.*, 904 N.E.2d 1257, 1260 (Ind. 2009). Because Indiana
Code subsection 31-35-2-4(b)(2)(B) is written in the disjunctive, the trial court is
required to find that only one prong of subsection 4(b)(2)(B) has been
established by clear and convincing evidence. *In re A.K.*, 924 N.E.2d 212, 220
(Ind. Ct. App. 2010).

[16]     Clear and convincing evidence need not establish that the continued custody of
the parent is wholly inadequate for the child's very survival. *Bester*, 839 N.E.2d
at 148. It is instead sufficient to show by clear and convincing evidence that the
child's emotional and physical development are put at risk by the parent's
custody. *Id.* If the court finds the allegations in a petition are true, the court
shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[17]     The purpose of terminating parental rights is not to punish parents but instead
to protect children. *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004).
Although parental rights have a constitutional dimension, the law allows for
their termination when the parties are unable or unwilling to meet their
responsibilities as parents. *Id.* Indeed, parental interests must be subordinated to
the child's interests in determining the proper disposition of a petition to
terminate parental rights. *G.Y.*, 904 N.E.2d at 1259.

[18]     Mother claims that DCS failed to present sufficient evidence to prove either that
there is a reasonable probability that the conditions that resulted in the
children's removal will not be remedied or that continuation of the parent-child

relationship poses a threat to the children's well-being. In her brief, Mother focuses on the reasons for the children's removal, i.e., her inadequate housing and lack of income, and cites to her own uncorroborated testimony in support of her claim that she has remedied those conditions.[3]

[19] Mother does not raise an independent argument concerning the trial court's finding that continuation of the parent-child relationship poses a threat to the children's well-being. She has therefore waived the issue on appeal. See Ind. Appellate Rule 46(A)(8). Moreover, Indiana Code section 31-35-2-4(2)(B) is written in the disjunctive, and therefore, only one of the three requirements of the subsection must be established by clear and convincing evidence. *See In re L.S.*, 717 N.E.2d at 209.

[20] Waiver notwithstanding, we consider whether DCS proved by clear and convincing evidence that continuation of the parent-child relationship poses a threat to the children. Mother has not had a stable home or income for the two years preceding the fact-finding hearing. Mother declined to remain in Indiana despite DCS's advisement that leaving the state would hinder her ability to reunify with the children. She left the Terre Haute area to move to Indianapolis,

---

[3] Mother testified that she has been approved for Section 8 housing in Michigan and is applying for Social Security benefits, but she presented no other evidence to support her testimony. She also admitted that she is not currently living in Section 8 housing. Even if the trial court had credited Mother's testimony, Mother still did not have stable housing or income on the date of the fact-finding hearing, nearly two years after the children were removed from her care.

and then later to Michigan, knowing that she lacked transportation to return to Terre Haute to participate in visitation with her children.

[21] During Mother's brief return to Terre Haute, she did not attend all of the scheduled therapeutic visitations. Those that she did attend went poorly, according to the supervisors and therapists in attendance. Mother was preoccupied with making telephone calls or with social media, at the expense of focusing on her children during their limited time together. She could not maintain discipline of the children and refused to heed parenting suggestions made by the therapeutic visitation supervisor. She rough-housed with one child, and when the child started crying, Mother refused to stop until the visitation supervisor intervened. Mother also refused to participate in some services offered to her and described them as useless. Since Mother's move to Michigan in the spring of 2019, Mother has not seen the children.

[22] Mother effectively abandoned her children after they were removed from her care in January 2018. Mother's limited attempts to reunify with her children demonstrated that she lacked skills needed to parent the children. For all of these reasons, we conclude that the trial court's finding that continuation of the parent-child relationship poses a threat to the well-being of the children is supported by clear and convincing evidence.

## Conclusion

[23] We agree with Mother's argument that four of the trial court's findings were not supported by clear and convincing evidence. We did not consider those findings

in reaching our conclusion that the trial court's termination order is supported by clear and convincing evidence.

[24] Affirmed.

Bradford, C.J., and Najam, J., concur.