## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 24 2020, 9:19 am

**C L E R K**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

R. Patrick Magrath
Alcorn Sage Schwartz & Magrath, LLP
Madison, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General

Samuel J. Sendrow
Certified Legal Intern
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of: K.D-C., Kag.D., Kan.D., Kai.D., Ko.D. (Minor Children);

H.C. (Mother) and B.D. (Father),

*Appellants-Respondents,*

v.

Indiana Department of Child Services,

August 24, 2020

Court of Appeals Case No. 20A-JT-633

Appeal from the Jennings Circuit Court

The Honorable Jon W. Webster, Judge

Trial Court Cause Nos.
40C01-1909-JT-37
40C01-1909-JT-38
40C01-1909-JT-39
40C01-1909-JT-40
40C01-1909-JT-41



*Appellee-Plaintiff.*

**Najam, Judge.**

## Statement of the Case

H.C. ("Mother") and B.D. ("Father") (collectively, "Parents") appeal the juvenile court's termination of their parental rights over their minor children: K.D.-C., born September 11, 2011; Kag.D., born November 29, 2012; Kan.D., born May 30, 2014; Kai.D., born June 9, 2015; and Ko.D., born August 6, 2016 (collectively, the "Children"). Parents raise one issue for our review, namely whether the juvenile court clearly erred when it terminated their parental rights. We affirm.

## Facts and Procedural History

Mother gave birth to Parents' sixth child, A.C., on September 28, 2017. A.C. was born prematurely, and she had "a chronic lung issue," which caused her to remain in the hospital for several months following her birth. Tr. at 51. In January 2018, the Indiana Department of Child Services ("DCS") received reports that Parents were not visiting A.C. in the hospital and that volunteers would have to hold A.C. because she received "such little stimulation." *Id*. at 215. DCS also received information that, when Mother would visit A.C.,

"there was a smell of odors," including animal feces and animal urine. *Id*. at 51.

[3] Due to A.C.'s health issues, the hospital would not release her to Parents' care without a home check. Parents did not cooperate, so DCS filed a motion to compel Parents to allow DCS to visit the home, which motion the juvenile court granted. DCS Family Case Manager ("FCM") Johnna Badger and law enforcement officers then visited Parents' home, where they resided with the Children. FCM Badger had "concerns" about the home environment because there was "animal feces throughout the home, including on the walls" and because there was a smell of ammonia that was so strong that officers and DCS employees "had to step out of the home a couple times." *Id*. at 52. FCM Badger also noticed a "mold buildup" in the bathroom and a lack of food in the house. *Id*. When FCM Badger spoke to Mother about the condition of the home, Mother "reported that she felt that the home was sanitary" and that she "cleaned daily." *Id*. at 53.

[4] Due to the condition of the home, FCM Badger removed the Children from the home.[1] FCM Badger and other DCS employees then began to clean off the Children because they had animal feces on their feet. Once the Children were clean, DCS employees noticed bruising on the Children. Accordingly, FCM

---

[1] It is not clear from the record when A.C. was released from the hospital or whether she was initially released into Parents' care. However, the record indicates that A.C. was ultimately placed in foster care. A.C. died during the underlying CHINS proceedings while in foster care.

Badger took the Children to the hospital to be evaluated. Medical professionals believed that the bruising was "abnormal," and there was a "concern" that the bruises were "inflicted." *Id*. at 60. Two of the older children later made statements indicating that Parents had injured them.

[5] On March 7, DCS filed petitions alleging that the Children were Children in Need of Services ("CHINS") based on the condition of the home and the violence toward the Children. The juvenile court then held a hearing at which Parents admitted the allegations in the CHINS petitions. Accordingly, the court adjudicated the Children to be CHINS. Thereafter, the court entered its dispositional decree and ordered Parents to participate in services.

[6] On September 11, 2019, DCS filed petitions to termination Parents' parental rights over the Children. Following a fact-finding hearing, the juvenile court entered the following findings and conclusions:

> There is a reasonable probability that the conditions that resulted in the [C]hildren's removal or the reasons for placement outside the [P]arents' home will not be remedied, and that the continuation of the parent-child relationship[s] poses a threat to the well-being of the [C]hildren, because:
>
> * * *
>
> 8. On or about January 18, 2018, [DCS] received a report alleging that [A.C.] (younger sibling of [the Children]) was the victim of child abuse or neglect with both [P]arents as the perpetrators. Specifically, it was alleged that [A.C.], an infant, had been in the hospital since birth (September 28, 2017) due to severe medical needs. The hospital had concerns that they were

unable to contact Parents and were unable to release [A.C.] until a home check could be completed. Additional concerns included hospital staff noting a strong odor on the items and clothing [P]arents brought in from home.

* * *

11. On March 2, 2018, [FCM] Badger visited the home with [FCM] Tonya Luviano and law enforcement personnel to execute the Motion to Compel.

12. Upon entering the home, FCM[] Badger observed the home to be filthy. Specifically, she observed feces throughout the home, trash, and a puzzling lack of furniture for a family of eight. A toilet was filled with human feces, apparently not flushed in weeks. She described the smell of the home to be one of animal urine, an odor so strong that she and the grown men from law enforcement had to repeatedly excuse themselves to step outside to catch their breath. Father later testified that he had not noticed a smell at all at this time.

* * *

14. When questioned about the home conditions on March 2, 2018, Mother stated that she cleaned and sanitized the home daily and did not see any concerns. Mother testified on November 19, 2019 that she still did not understand why DCS had gotten involved due to concerns over home conditions. She testified that they were "handling things on their own."

* * *

19. Shortly after the detention, DCS learned of additional allegations of physical abuse against the [C]hildren. Some of the

children were brought to Riley to have their bruising examined, and Riley physicians determined that the bruising was abnormal and suspicious, likely inflicted. [K.D.-C.] and [Kag.D.] also made corroborating statements that they had been injured by their parents. . . .

20. In March of 2018, [P]arents were referred for home-based case work through National Youth Advocate Program ("NYAP"), a referral which remains active at today's date.

* * *

28. It should be noted that the family has extensive DCS history prior to the current case. Parents have had five different substantiations of child abuse and/or neglect in the last five years in Indiana beginning in 2014. Many were for similar issues of home conditions and hygiene of the children. It is clear that the issues leading to the current removal of the children were not isolated, but rather a chronic pattern of severe neglect.

* * *

34. On September 6, 2018 the Court issued a dispositional order wherein [P]arents were ordered to participate in services. In pertinent part, [P]arents were ordered to maintain suitable safe, and stable housing; to keep the family residence in a manner that is structurally sound, sanitary, clean, free from clutter, and safe for the [C]hildren; to enroll in any programs recommended by the team and participate in those programs; to secure and maintain a legal and stable source of income; and to demonstrate an ability to appropriately parent and supervise the [C]hildren.

35. Both parents were recommended for Mental Health Assessments. Both parents completed this assessment at Adult

and Child Mental Health Center, Inc. on September 18, 2018. . . .

36. Parents were referred for individual therapy at Adult & Child. Mother completed an intake in September of 2018. She completed three therapy sessions in October of 2018. Father completed an intake in September of 2018 but never attended a single therapy session.

* * *

39. FCM [Emily] Ooms visited the [P]arents in their new apartment in Indianapolis for the first time on December 10, 2018. Parents had left the filthy home in North Vernon where the [C]hildren were removed from and moved to Indianapolis several months after removal. At that home visit, FCM Ooms noted no concerns other than a conspicuous lack of furniture. This is a concern that was echoed by other witnesses including visit supervisors and Guardian ad Litem ("GAL") Jesseka Gibson—that the parents had hardly any furniture in the home and only had one bed for the five children. The [P]arents do have multiple expensive looking gaming systems in the home.

* * *

41. Father was referred and court ordered to complete Anger Management due to the violence in the home disclosed by the [C]hildren. In June of 2019, Father completed an intake for the Anger Management program at Life Recovery Associates LLC. The recommendations were for Father to complete a 26-week program. Father attended 4 out of 26 scheduled sessions. He was discharged as unsuccessful from the program, though he could restart the curriculum at any time. He has not done so, despite testifying that he had learned some valuable information from the few sessions he did attend. Father testified that he does

not believe he needs any domestic violence services despite the statements of his children that they had been physically abused by him.

42. FCM Ooms visited the [P]arents' home on July 19, 2019 to inspect the home conditions. She noted concerns such as an extremely foul odor in the home that smelled like cat urine, dirty dishes and food that had been sitting out for days from the [C]hildren's last visit, a litter box full of cat feces, and black mold in the toilet.

43. On October 16, 2019, FCM Ooms visited the home again. . . . The odor in the home had improved, which FCM Ooms learned was not because [P]arents had done anything proactive to address it, but rather because one of the cats had run away. Many of the other concerns were still present, such as dirty dishes and old food sitting out and the continued issue of black mold in the toilets.

* * *

45. Almost two years into this case, [P]arents are still unable to address the simplest concerns of keeping a home sanitary for children, such as cleaning toilets periodically and addressing foul odors.

* * *

50. In the year and a half that this case has been open, Mother has attended three therapy sessions and Father has attended zero therapy sessions, despite two assessments indicating that therapy was very important for the [P]arents and despite the repeated urging of both DCS and GAL Gibson. Neither parent has been discharged successfully from any mental health services.

* * *

55. Multiple witnesses expressed concern regarding home conditions at visitations with the [C]hildren. The home is not consistently safe and sanitary.

* * *

58. Visit supervisors testified that the conditions in the home where visits were taking place were also concerning. Specifically, the bathroom is not clean, there are often old dirty dishes out from the previous visit, there is a strong odor in the home of both cat urine and body odor, and there is not sufficient furniture in the home for the [C]hildren.

* * *

62. At one visit, Father injured [K.D.-C.] by twisting his arm, causing [K.D.-C.] to require medical treatment for a sprain. This presents a major concern as one of the main issues in this case was the physical abuse endured by the [C]hildren prior to removal. If Father injures children in a fully supervised visit[], it is alarming to consider what might happen behind closed doors if these children were to return to [P]arents' care.

* * *

65. Rachel Otto, visit supervisor, testified similarly that she was never able to recommend that visits transition to unsupervised. In fact, she requested a *decrease* in visitation time due to the negative impact visits were having on the [C]hildren.

* * *

84.  The two fundamental issues at the beginning of this case were the conditions of the home/instability and the physical abuse endured by the [C]hildren.  Neither parent has made any meaningful progress in addressing either of these issues.  Parents' home still shows major concerns regarding its cleanliness, and that is without five presumably messy young children residing there.  Major parenting concerns have been observed at supervised visits that have not improved.  Parents have utterly failed to address their underlying mental health concerns and parenting deficits, impairing their ability to safely and appropriately parent their children.

85.  It is unlikely that the conditions that led to the removal of the [C]hildren from their [P]arents' care will be remedied.

* * *

94.  The [C]hildren are placed with Mother's cousin and his fiancé[e].  All five children are placed together, an impressive feat for such a large group of siblings.  The relative placements are also licensed foster parents who have received training in providing care to victims of abuse and neglect like these children.  The [C]hildren are thriving in their current placement.  DCS has no concerns about the relatives' ability to take care of the [C]hildren.  The relative testified that he and his fiancé[e] intend to adopt the [C]hildren if parental rights are terminated.

* * *

**Termination is in the best interests of the children in that:**

1. Johanna Maulin, therapist with NYAP testified that she sees [Kan.D.] for therapy weekly.  Ms. Maulin testified that [Kan.D.] has issues with expressing emotions, night terrors, and having

accidents in her pants at school, but that these issues have greatly improved the longer [Kan.D.] has been experiencing stability with her current relative placement. She observes that [Kan.D.] is extremely well-bonded with her foster parents and that she is safe and secure in that setting.

2. [Kan.D.] and the other four children have thrived in the care of their relative as, for perhaps the first time in their young lives, the [C]hildren are in a safe, stable, and structured home.

\* \* \*

7. Neither parent has made any notable improvements in parenting skills either, despite almost two years of fully supervised visits that included education and feedback on their significant parenting deficits.

8. Parents are overall not receptive to making any changes because they do not believe that they have done anything wrong in the first place.

9. Parents' behavior in this case can be summarized in a single word: unmotivated. Parents exhibit no level of urgency in participating in any concrete activity that would get them closer to reunifying with their children. Parents have apparently inexhaustible amounts of excuses for their lack of compliance. It is unlikely that this behavior will be remedied.

10. Comparing the photographs of the [C]hildren at the time of removal (Exhibits 13-28) with the photographs included on GAL's Termination Report speaks volumes as to the horrible physical condition of the [C]hildren at that time and the improvements made since then. Evidence would indicate that

similar improvements have been made in the [C]hildren's emotional states.

11. Parents have not enhanced their ability to safely and appropriately parent their children.

12. GAL Gibson and FCM Ooms do not believe it would be in the [C]hildren's best interest to give [P]arents more time to complete services and attempt to reunify with their children.

Appellant's App. Vol. II at 138-152 (emphases in original). The trial court also concluded that DCS has a satisfactory plan for the care and treatment of the Children. Accordingly, the court terminated Parents' parental rights. This appeal ensued.

# Discussion and Decision

[7] Parents contends that the trial court erred when it terminated their parental rights over the Children. We begin our review of this appeal by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *Bailey v. Tippecanoe Div. of Fam. & Child. (In re M.B.)*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *Schultz v. Porter Cty. Off. of Fam. & Child. (In re K.S.)*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* Although the right to raise one's own child

should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* at 836.

[8] Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove:

> (B) that one (1) of the following is true:
>
>> (i)  There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii)  There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> * * *
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (2020).  DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'"  *R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.)*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

[9] When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Peterson v. Marion Cty. Off. of*

*Fam. & Child. (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Judy S. v. Noble Cty. Off. of Fam. & Child. (In re L.S.)*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[10] Here, in terminating Parents' parental rights, the trial court entered specific findings of fact and conclusions thereon. In general, when a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cty. Off. of Fam. & Child.*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. *Id.* However, here, Parents do not specifically challenge any of the trial court's findings. As such, we must simply determine whether the unchallenged findings support the court's judgment. *See J.M. v. Ind. Dep't of Child Servs. (In re A.M.)*, 121 N.E.3d 556, 562 (Ind. Ct. App. 2019).

[11] On appeal, Parents contend that the trial court clearly erred when it concluded that the conditions that resulted in the Children's removal from their care will not be remedied and that termination of the parent-child relationships is in the Children's best interests. We address each argument in turn.

*Reasons for Removal from Parents' Home*

[12]    Parents first contend that the trial court erred when it concluded that the conditions that resulted in the Children's removal from their care will not be remedied. However, in addition to concluding that there is a reasonable probability that the conditions that resulted in the Children's removal will not be remedied, the court also concluded "that continuation of the parent-child relationship[s] poses a threat to the well-being of the [C]hildren[.]" Appellant's App. Vol. II at 138. But Parents do not challenge that conclusion. Because Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, Parents' failure to challenge the second prong means that they have waived our review of the sufficiency of the findings to support the court's conclusion on either prong.

[13]    Waiver notwithstanding, the trial court's findings support its conclusion that the conditions that resulted in the Children's removal and the reasons for placement outside of Parent's home will not be remedied. To determine whether there is a reasonable probability that the reasons for the Children's removal will not be remedied, the trial court should judge a parent's fitness to care for the Children at the time of the termination hearing, taking into consideration evidence of changed conditions. *See E.M. v. Ind. Dep't of Child Servs. (In re E.M.)*, 4 N.E.3d 636, 643 (Ind. 2014). However, the court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Moore v. Jasper Cty. Dep't of Child Servs.*, 894 N.E.2d 218, 226 (Ind. Ct. App. 2008) (quotations and citations

omitted). Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id*. Moreover, DCS is not required to rule out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *Id*.

[14] Here, the trial court found, and Parents do not dispute, that DCS removed the Children because the home was "filthy." Appellant's App. Vol. II at 139. Indeed, there was animal feces "throughout the home"; a toilet "was filled with human feces, apparently not flushed in weeks"; and there was a smell of animal urine so strong that grown men had to repeatedly excuse themselves to step outside. *Id*. The trial court also found that, following the removal of the Children, DCS observed bruising on some of the Children and that two of the Children "made corroborating statements that they had been injured by" Parents. *Id*. at 140. Accordingly, the court found that the "two fundamental issues" in this case were the conditions of the home and the physical abuse of the Children by Parents.

[15] However, the court also found that Parents have not "made any meaningful progress in addressing either of these issues." *Id*. at 149. Specifically, the court found that, almost two years into the case, the home "still shows major concerns regarding its cleanliness" and that "[m]ajor parenting concerns have been observed at supervised visits that have not improved." *Id*. Further, the court found that Parents have not completed any service and that they have

"utterly failed to address their underlying mental health concerns and parenting deficits, impairing their ability to safely and appropriately parent their children." *Id*. The court's undisputed findings, coupled with the court's findings regarding Parents' five prior substantiations for "similar issues of home hygiene" dating back to 2014, support the trial court's conclusion that the reasons for the Children's removal from Parents' care will not be remedied.

### *Best Interests*

[16] Parents also contend that the trial court erred when it concluded that the termination of the parent-child relationships was in the Children's best interests. In determining what is in a child's best interests, a juvenile court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *A.S. v. Ind. Dep't of Child Servs. (In re A.K.)*, 924 N.E.2d 212, 223 (Ind. Ct. App. 2010). A parent's historical inability to provide "adequate housing, stability, and supervision," in addition to the parent's current inability to do so, supports finding termination of parental rights is in the best interests of the child. *Id*.

[17] As the trial court's undisputed findings demonstrate, Parents have not shown that they are capable of parenting the Children. Other than their compliance with visitation, Parents did not complete their court-ordered services to address the housing and violence issues. Indeed, the court found that Parents have not "made any notable improvements in parenting skills, despite almost two years of fully supervised visits that included education and feedback on their significant parenting deficits." *Id*. at 151. The court also found that all of the

Children are placed in one foster home, which is a pre-adoptive home, and that they are thriving. And the court found that GAL Gibson and FCM Ooms "do not believe it would in the [C]hildren's best interest to give [P]arents more time to complete services and attempt to reunify with their children." *Id.* at 152. Those findings support the court's conclusion that termination of the parent-child relationships is the Children's best interests. We therefore affirm the termination of Parents' parental rights over the Children.

[18] Affirmed.

Bradford, C.J., and Mathias, J., concur.